Shawn R. Perez, Esq.
Nevada Bar No. 10421
**Law Offices of Shawn R. Perez**
7121 W. Craig Road, #113-38
Las Vegas, Nevada 89129
(949) 492-9545 Telephone
(702) 485-3977 Telephone
shawn711@msn.com

Ariel Mitchell, Esq. *(pro hac vice)*
**The Law Office of Ariel Mitchell, P.A.**
500 NW 2nd Ave. #12864
Miami, FL 33101
Tel: (305) 903-5835
ariel@arielesq.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHLEY PARHAM, JANE DOE, and JOHN DOE )<br><br>Plaintiffs, )<br><br>v. )<br><br>)<br>)<br>SEAN COMBS a/k/a )<br>"P. Diddy," "Puff Daddy," "Love," )<br>"Puffy" and "Diddy," )<br>KRISTINA KHORRAM, )<br>SHANE PEARCE, )<br>RUBEN VALDEZ, )<br>JOHN PELLETIER, )<br>ODELL BECKHAM JR., )<br>DREW DESBORDES a/k/a "Druski," )<br>JACQUELYN WRIGHT a/k/a "Jaguar )<br>Wright", HELENA HARRIS-SCOTT, )<br>MATIAS GONZALEZ, )<br>BRANDI CUNNINGHAM, )<br>JANICE COMBS, )<br>KEITH LUCKS a/k/a "Big Homie CC," )<br>and JOHN and JANE DOES 1-10 )<br>)<br>Defendants. ) | Case No.: 3:24-cv-07191-RFL<br><br>**AMENDED COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

<div style="border:2px solid">

**TRIGGER WARNING:**
**THIS DOCUMENT CONTAINS HIGHLY GRAPHIC INFORMATION OF A SEXUAL NATURE INCLUDING ALLEGATIONS OF RAPE. SEXUAL ASSAULT. SEXUAL BATTERY. KIDNAPPING AND SEX TRAFFICKING.**

</div>

Plaintiff, Ashley Parham ("Parham"), John Doe and Jane Doe ("John Doe") and ("Jane Doe") (together, "Plaintiffs") files there Complaint against Defendants Sean Combs ("Diddy"), Kristina Khorram ("KK"), Shane Pearce ("Shane"), Ruben Valdez ("Valdez"), John Pelletier ("Pelletier"), Odell Beckham Jr. ("Odell"), Drew Desbordes ("Druski"), Jacquelyn Wright ("Jaguar"), Helena Harris-Scott ("Helena"), Matias Gonzalez ("Gonzalez"), Brandi Cunningham ("Brandi"), Janice Combs ("Janice"), Keith Lucks ("Big Homie CC") and John and Jane Does 1-10 ("Does") (together, "Defendants"), allege as follows:

## INTRODUCTION

1. This case involves RICO enterprise for the purpose of sexual assault, battery, rape, sexual abuse, false imprisonment and kidnapping for the personal and financial benefit to the enterprise participants.

2. Defendant Diddy has been sued by countless individuals for crimes similar to the ones enumerated in this Complaint.

3. Defendant Diddy is currently a federal inmate awaiting criminal trial for crimes similar to the ones enumerated in this Complaint.

4. Defendant KK is an employee of Defendant Diddy often referred to by Defendant Diddy as his right-hand woman.

5. Defendant Diddy's predatory behavior was constant and was well known by several individuals including Defendant Diddy's employees, staff, friends, family and associates. In fact, Defendant Diddy's sons are being sued for engaging in the same

type of deviant behavior as their father as plead in a Los Angeles Superior Court filing.[1]

6. Defendant Diddy was able to effectuate his crimes and evade capture and prosecution for his crimes for almost 30 years due to his position of power and influence in the entertainment industry. Defendant Diddy exploited his position and his relationships with powerful individuals to force sexual acts through exploitation, fear, manipulation, physical threats, emotional abuse, intimidation and retaliation.

7. Had any of the previous victims of Defendant Diddy been taken seriously or had any of the abettors reported Defendant Diddy's actions to law enforcement, Defendant Diddy's illegal and unfathomable behavior could have been prevented. Instead, Defendant Diddy was able to reign his abuse and terrorism on countless victims for over 30 years.

8. Additionally, had Defendant Diddy's numerous business partners and associates not ignored Defendant Diddy's deviant behavior, Defendant Diddy would have been unable to continue his pattern of abuse over such a long period of time.

9. As alleged herein, Defendant Diddy abused his position of power in the entertainment industry to garner loyalty and trust from the public at large, and law enforcement, while instilling fear and intimidation in the hearts of his voluminous victims. Allegations against Defendant Diddy have been disregarded for decades therefore creating a failure to protect victims, like the Plaintiffs named herein.

---

[1] Case number 24-ST-CV-08571

10. Unlike most victims of Defendant Diddy, who were employees, sex workers, or individuals seeking out Defendant to help launch their careers, Plaintiff Parham does not fall into any of those categories. Plaintiff Parham met Defendant Diddy due to happenstance and still ended up being brutally victimized, in a similar manner as described by the others who have proceeded her filing and others who surely will follow including Plaintiff Does herein.

11. Plaintiffs John and Jane Doe met with Defendant Diddy through their connections in the music industry as Plaintiff John Doe was a previous Plaintiff against Michael Jackson for sexual assault as a minor.

12. Due to Defendants agreement to participate in a corrupt enterprise, Plaintiffs and countless other victims have been immeasurably and permanently harmed. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experience, and, as to all other matters, upon information and belief, including investigations conducted by their attorneys.

**PARTIES**

13. Plaintiff Ashley Parham is an individual who resides in and is domiciled in California.

14. Plaintiff John Doe is an individual who is domiciled in Nevada and resides in another state purposefully to protect his safety and identity.

15. Plaintiff Jane Doe is an individual who is domiciled in Nevada and resides in another state purposefully to protect her safety and identity.

16. Defendant Sean Combs (Defendant "Diddy") is an individual who resides in and is domiciled in California. Defendant also owns a residence in Florida. However, Defendant Diddy is currently an inmate at MDC in Brooklyn, NY.



17. Defendant Kristina Khorram (Defendant "KK") is an individual who, upon information and belief, resides in and is domiciled in either California or North Carolina.



18. Defendant Shane Pearce (Defendant "Shane") is an individual who resides in and is domiciled in California.



**Shane Pearce**
Restaurant Manager at Sir Francis Drake, A Kimpton Hotel

19. Defendant Ruben Lira Valdes (Defendant "Valdez") is an individual who resides in and is domiciled in California.



20. Defendant John Lawrence Pelletier (Defendant "Pelletier") is an individual who resides in and is domiciled in Nevada or Hawaii.

 

21. Defendant Odell Beckham Jr. (Defendant "Odell") is an individual who resides in and is domiciled in Florida (previously referred to as John Doe in Plaintiff Parham's original complaint).



22. Defendant Drew Desbordes (Defendant "Druski") is an individual, who upon information and belief, resides in and is domiciled in either Maryland or Georgia (previously referred to as John Doe in Plaintiff Parham's original complaint).



23. Defendant Jacquelyn Wright (Defendant "Jaguar") is an individual, who upon information and belief, resides in and is domiciled in California or Nevada.



24. Defendant Helena Harris-Scott (Defendant "Helena") is an individual, who upon information and belief, resides in and is domiciled in California.



25. Defendant Matias Gonzalez (Defendant "Gonzalez") is an individual, who upon information and belief, resides in and is domiciled in Nevada.

26. Defendant Brandi Cloninger Cunningham (Defendant "Brandi") is an individual who upon information and belief resides in and is domiciled in Arkansas (previously referred to as Jane Doe in Plaintiff Parham's original complaint).



27. Defendant Janice Combs (Defendant "Janice") is an individual who resides and is domiciled in Florida.



28. Defendant Keith Lucks (Defendant "Big Homie CC") is an individual who, upon information and belief, resides and is domiciled in Nevada.



29. Defendant John and Jane Does 1-10 (Defendant "Does 1-10") are individuals who, upon information and belief, reside in and are domiciled in various states but mainly California.

## JURISDICTION, VENUE, TIMELINESS AND CALIFORNIA'S SEXUAL ABUSE AND COVER-UP ACCOUNTABILITY ACT

30. This Court has federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367 for the State law claims alleged.

31. This Court has personal jurisdiction over all Defendants because they have purposely availed themselves, are residents of the State and/or were conducting business in California and this lawsuit arises out of acts that occurred in California and relates to their contacts with California. Further, the pervasive culture of abuse, including sexual assault, rape, inappropriate touching and wielding power and control over Plaintiffs were a constant presence when Defendant Diddy and the other herein named Defendants engaged in the acts described herein. The location of all the relevant events herein alleged occurred within the jurisdiction of California.

32. Plaintiffs were harmed and injured in California by Defendants.

33. Venue is proper in this judicial district under 28 U.S.C. § 1391, (b)–(c). Further, venue is proper in this judicial district pursuant to 18 U.S.C. §1965.

34. This action is timely under Federal Racketeering Influenced and Corrupt Organization Act (RICO), 18 U.S.C. 1961 *et seq.*, as the Diddy Sexual Abuse and Cover Up Enterprise fraudulently concealed the ongoing sexual and deceitful activity, torts and conspiracy taking place within the Diddy Sexual Abuse and Cover Up and Enterprise.

1    35. This action is also timely under California's Sexual Abuse and Cover Up

2         Accountability Act. California's Sexual Abuse and Cover Up Accountability Act

3         (AB-2777) amended California Civil Procedure Section 340.16, extending the

4         statute of limitations, opening up revival windows for adult survivors of sexual

5         assault and related claims and acknowledging that a "two-year statute of limitations

6         simply does not provide sexual assault survivors adequate time to heal from the

7         physical and emotional trauma of a sexual assault and prepare for a civil case."

8         California Bill Analysis, A.B. 2777 Assem., 6/14/2022.

9

10

11              (g) When the perpetrator is someone a victim trusts, it can take years for the
                 victim even to identify what happened to them as a sexual assault.

12

13              (h) For these reasons, it is self-evident that the unique nature of the emotional
                 and psychological consequences of sexual assault, especially on women, can
14               paradoxically permit wrongdoers to escape civil 26 accountability unless
                 statutes of limitation are crafted to prevent this injustice from occurring.

15

16              (i) Moreover, when these data are combined with widespread news reports of
                 major companies being accused of covering up sexual assaults by their
17               employees it is self-evident that statutes of limitation for sexual assault need
                 to be crafted in a way that does not cause the covering-up company to enjoy
18               the fruits of their cover-up solely because our statutes of limitation permit,
                 and thus motivate, such behavior.
19

20    Section 340.16(Sec. 2)(g–i).

21

22    36. Defendants' fraudulent concealment through active attempts of cover up caused the

23         ongoing trauma Plaintiffs suffer. Plaintiff Parham had repressed her experience until

24         recently when Defendant Diddy was accused by his ex-girlfriend, former employee

25         Cassie Ventura, and others regarding their experiences with Defendant Diddy.

26         Accessing the civil justice system allows victim-survivors an opportunity to seek

27         accountability for the years of suffering caused by the abuse they experienced and a

28

chance to take back the power they lost as a result of the sexual assault. Plaintiffs John and Jane Doe have been paralyzed in fear, have had to change their names and frequently move from their residences for fear of being rekidnapped, raped, abused and assaulted by Defendants herein. Plaintiff Does hereby invoke a pseudonym to protect their lives from the long reach of the Diddy Sexual Abuse and Cover Up and Enterprise.

37. Additionally, any statute of limitations applicable to the below claims, if any, is tolled and Defendants are estopped from raising such a defense as their actions described below deprived Plaintiff of the opportunity to commence this lawsuit before now, as well as other equitable and legal bases.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### (Plaintiff Parham)

38. Plaintiff met Defendant Shane in February 2018, after an altercation with another man at a bar and Defendant Shane came to Plaintiff's rescue.

39. While outside the bar, with friends and other patrons, Defendant Shane Facetime video called Defendant Diddy and was showing people Defendant Diddy in the video on his phone, attempting to impress the people with his famous friend.

40. Defendant Shane then showed Plaintiff Defendant Diddy on his video call, which Plaintiff ignored, stating she was not impressed by him knowing Defendant Diddy because she believed Defendant Diddy had something to do with the murder of rapper Tupac Shakur.

41. Visible in the Facetime call was Defendant Diddy, and some of his children including his sons Christian and Quincy. It appeared from the Plaintiff's perspective Defendant Diddy was having a "get together" at his home during the time of the Facetime call with Defendant Shane.

42. Defendant Diddy heard Plaintiff's statement and made a remark that Plaintiff would "pay" for her statement regarding Tupac and overall dismissal of Defendant Diddy.

43. On March 23, 2018, Defendant Shane invited Plaintiff over to his home to assist him with his cancer medications because he stated he was weak and unable to open his medications.

44. Upon Plaintiff's arrival, Defendant Shane informed Plaintiff that he wanted to give her a ride in his new car. Plaintiff and Defendant Shane left his residence for a brief period and then returned.

45. Once they returned, Defendant Shane left the door to his apartment partially open and stated that the door was ajar because there was an issue with the door where it couldn't close completely.

46. Defendant Shane was renting an apartment on the lower floor of a home in Orinda, California.

47. Defendant Shane had a separate entrance into his residence that led to the backyard of the home. The home also had a main entrance on Loma Vista Drive.

48. Defendant Shane rented the home from a woman who lived in the upstairs portion of the home and had two dogs who resided with her.

49. Plaintiff and Defendant Shane then began to watch a movie and Defendant Shane offered her a glass of water, which he retrieved and brought back to Plaintiff.

50. Approximately ten minutes after Plaintiff and Defendant Shane returned from their drive, Defendant Diddy entered Defendant Shane's residence.

51. Defendant Diddy entered the home in a grand "ready to party" manner. His grandiose entrance was so loud that the dogs upstairs began barking.

52. Defendant Diddy did not enter the home through the backyard entrance but instead through the main entrance.

53. Along with Defendant Diddy were his bodyguard Defendant Big Homie CC, Defendant KK, Defendant Brandi, Defendant Doe 2 who upon information and belief is a friend of Defendants Shane and Diddy and Defendant Diddy's driver, Doe 3, who remained outside and in his vehicle during the duration of Plaintiff's assault.

54. Plaintiff believes Defendant Shane invited her over to "set her up" to be assaulted by Defendant Diddy because of the statement she made about Defendant Diddy a month prior.

55. Upon Defendant Diddy's arrival he immediately began to antagonize the Plaintiff stating that "she thought she would never see him in person," "pay" for her

statements about Tupac during the videocall and that Defendant Diddy "caught" Plaintiff.

56. Plaintiff was in shock as she never believed that she would ever see or meet Defendant Diddy in real life let alone in the small apartment rented by Defendant Shane.

57. Defendant Diddy then began advancing towards where Plaintiff was sitting on Defendant Shane's bed with a knife and held it to the right side of Plaintiff's face and threatened to give her a "Glasgow smile" in retaliation for her previous statements on the video call.

58. Defendant KK told Defendant Diddy that she did not think giving Plaintiff a "Glasgow smile" would be advantageous to their potential clients who they could "sell" Plaintiff for sex to.

59. Defendant KK then made a threat to Plaintiff that they could ship her off anywhere in the world and that she would never see her family or anyone she knew ever again.

60. Defendant Shane then partially undressed Plaintiff then Defendant Diddy removed the remainder of Plaintiff's clothing, removing the knife from her face and then retrieved a bottle of liquid from a large fanny pack.

61. Defendant Diddy then squirted a bottle of liquid on Plaintiff which placed her in fear that she was being squirted with a chemical substance like acid. Plaintiff soon

realized the substance was an oil/lubricant. Plaintiff was squirted with this liquid substance over the entirety of her naked body.

62. Defendant KK was then told by Defendant Diddy to insert, what looked like a "syringe" from sterile packaging, into Plaintiff's vagina.

63. Defendant KK did as told, while assisted by Defendant Brandi,[2] and then told Defendant Diddy that they were unable to use the "IUD" because it had prematurely been released from its packaging.

64. Defendant Diddy, upset by this, took the "syringe" from Defendant KK and tried inserting it in Plaintiff's vagina instead.

65. Defendant KK and Diddy began to argue as Defendant KK continued to advise Defendant Diddy that since the "IUD" had been prematurely released from its packaging it was no way they could insert it into Plaintiff's vagina effectively. After some time, Defendant Diddy heeded the advice of Defendant KK and removed the syringe from Plaintiff's vagina and handed it to Defendant KK.

66. Defendants KK and Defendant Brandi then exited Defendant Shane's residence leaving Plaintiff alone with Defendants Diddy, Shane and John Does who have been named herein.

67. Defendant Diddy then picked up a television remote that was near Plaintiff and violently inserted it into Plaintiff's vagina.

---

[2] Plaintiff, upon information and belief, believe Defendant Brandi to be a registered nurse with the NCSBN ID: 22517094.

68. Defendant Diddy, while violently raping Plaintiff with a television remote, told Plaintiff that her life was in his hands and that if he wanted he could "take her" and she would never be seen again.

69. Plaintiff began hysterically crying from the threats by Defendant Diddy along with the pain of being violently vaginally raped by Defendant Diddy with the television remote as well as the lingering pain from the ordeal with the "IUD" syringe insertion.

70. Defendant Diddy, then instructed Defendant Shane to turn Plaintiff on her stomach seemingly tired of hearing the Plaintiff's blood curdling cries.

71. Defendant Shane then grabbed Plaintiff by her abdomen and hips and turned Plaintiff on her stomach. Defendant Diddy then instructed Defendant Shane to put a pillow over her head because he didn't want to see her face or hear her cries and instructed Defendant Shane to anally rape Plaintiff.

72. Defendant Shane did as he was told by Defendant Diddy and began to anally rape Plaintiff.

73. Defendant Diddy then violently raped Plaintiff anally after Defendant Shane.

74. Defendant Doe 2 then joined Defendants Diddy and Shane taking a turn anally raping Plaintiff.

75. Immediately after Defendant Doe 2 raped Plaintiff he exited Defendant Shane's residence.

76. Defendant Diddy then instructed another Defendant Doe to also rape Plaintiff; Defendant Doe has been determined to be Defendant Druski.

77. Instead of immediately raping Plaintiff, Defendant Druski doused Plaintiff with more oil/lubricant and then jumped on top of Plaintiff's naked and oiled body treating it like a slip and slide and knocking the wind out of Plaintiff due to his enormous size.

78. Defendant Druski then caught himself from sliding over Plaintiff's oiled body and off the bed, he then began raping Plaintiff vaginally.

79. While Defendant Druski was raping Plaintiff, Defendant Diddy sat in a chair near the bed and began masturbating while recording Plaintiff's rape by Defendant Druski.

80. Another party's phone fell on the bed near Plaintiff. Plaintiff then attempted to grab the phone but it slipped out of her hands and onto the floor due to the oil/lubricant that had been doused all over her person by Defendants Diddy and Druski.

81. Defendant Diddy began laughing at Plaintiff's attempt to grab the phone.

82. Throughout this violent gang rape Defendant Diddy made constant belittling remarks to Plaintiff including that he "owned her now."

83. At some point during this ordeal, Plaintiff remembers Defendants referring to another Defendant Doe as Cornelius and remembered the name because it was so

odd and unique. Plaintiff has come to discover the Defendant Doe Cornelius who raped her was Defendant Odell.

84. Plaintiff's body was becoming more and more limp over the course of the violent rape until eventually she had no control over her body nor could she move her body.

85. When Defendant Druski finished raping Plaintiff, Defendant KK entered the room to examine the condition of Plaintiff who was barely able to move or control her bodily functions.

86. Defendant KK examined Plaintiff to see if she needed assistance and was about to give Plaintiff an IV fluid. Plaintiff cannot be certain is she did or did not receive such intravenous intervention. Defendant KK then opened a different bag, different than the one Defendant Diddy removed the oil from, where Plaintiff observed several medicine bottles, IV fluid bags and other unidentifiable powder-like drugs. Defendant KK then removed a pill from one of the medicine bottles and gave it to Defendant Diddy.

87. Defendant Diddy then inserted the pill into Plaintiff's mouth and down her throat to where Plaintiff had no choice but to ingest the unknown pill.

88. Defendants Diddy, Shane, KK, Odell and Druski then exited the residence to the backyard where they smoked marijuana and cigarettes.

89. Plaintiff remained in an almost lifeless state in Defendant Shane's bedroom until she finally regained her bodily functions.

90. Plaintiff then began looking for her clothes and her purse, that contained her car keys and cell phone, but could not discover them in the room or anywhere in the apartment. Plaintiff was only able to find a t-shirt on the floor which she put on to cover her naked body. Plaintiff also observed a black condom wrapper on the floor of the bedroom which she assumed was used by one of the Defendants, most likely Defendant Diddy, during the rape.

91. Plaintiff then found a knife, with the assistance of the Doe Plaintiffs, and headed to the backyard where the Defendants were smoking as that was the only way to exit the premises onto the street.

92. Plaintiff concealed the knife on her left side as she exited the apartment to the backyard area.

93. Upon coming to the exit of the home which led to the backyard, Plaintiff was met by Defendant Big Homie CC who was standing at the door between the residence and the backyard.

94. By the time Plaintiff was able to compose herself and come to the backyard, Defendant KK was no longer in the backyard but upstairs on the patio/balcony with Defendant Brandi.

95. Defendant Doe allowed Plaintiff to walk to the backyard where Defendants were still smoking.

96. Defendant Doe did not see the knife that Plaintiff concealed on her left side as it was obstructed by the oversize t-shirt Plaintiff was wearing.

97. Plaintiff observed Defendant Diddy still partially nude from the assault while the other Defendants had on their clothing.

98. Defendant Shane then left to the upstairs portion of the patio/balcony where Defendants KK and Brandi were already situated.

99. Plaintiff then sat down on a makeshift seat in the backyard when Defendant Diddy noticed her presence and remarked that he was surprised she was able to walk because he had given her "enough drugs to take out a horse."

100. Plaintiff then asked Defendant Diddy what he gave her and he laughed and did not provide a response.

101. Defendant Diddy then made further comments to Plaintiff in a jovial, friendly, manner asking her why they hadn't "partied" together before because it was "so much fun" and he "hadn't had any ass that tight in a while."

102. Defendant Big Homie CC then quipped at Defendant Diddy that he probably hadn't had any "ass that tight" because he's not used to having anal sex with women, which Defendants Diddy and Doe laughed at.

103. Plaintiff then told Defendant Diddy she did not party with him and she did not enjoy partying with him and that he raped her.

104.    Defendant Diddy did not like Plaintiff's response to his lighthearted commentary and offered Plaintiff money and instructed Plaintiff to say that the violent rape was consensual and that Plaintiff was a sex worker.

105.    Plaintiff became enraged and yelled at Defendant Diddy that her rape was not consensual, she was not a sex worker and she refused to take any money from him and would tell the police that he had raped her.

106.    Defendant Diddy then told Plaintiff no one would ever believe she had been raped by him and if she did tell anyone such that they would harm her family.

107.    Defendant Big Homie CC then showed Plaintiff his phone which looked as if it was the outside of Plaintiff's, estranged, sister's residence as she could see her sister sitting on the couch and her sister's spouse on the balcony. It looked as if someone was outside the residence streaming this video to Defendant Big Homie CC's phone.

108.    Plaintiff, while rattled by what she was seeing on Defendant Big Homie CC's phone, was still angry about being gang raped and was not complying with Defendant Diddy's request to take the money being offered to say the rape was consensual.

109.    Defendant Diddy then called Defendant Janice in an effort to further convince Plaintiff not to report her assault. Defendant Janice yelled at Plaintiff to not hurt her son. Plaintiff told Defendant Janice that her son had violently raped Plaintiff. Defendant Janice, seemingly unphased by the statement, then continued

her demands with Plaintiff to take the money being offered and not report the rape to law enforcement.

110.    Defendant Diddy then made further threats that he had gotten off from bigger crimes than this and referred to Tupac again further antagonizing Plaintiff.

111.    Defendant Big Homie CC then turned to Defendant Diddy and pulled his gun on him asking him to repeat what he said in reference to Tupac.

112.    As the two of them were exchanging words Plaintiff went behind Defendant Big Homie CC where he seemingly began to protect Plaintiff.

113.    Defendant Big Homie CC then advanced to Defendant Diddy questioning him over the comments he made about Tupac.

114.    During this commotion, a neighbor directly across the street, came outside and peered into the backyard and asked what all the commotion was about. Defendant Big Homie CC then pointed the gun at the neighbor and instructed him to mind his business and return to his residence.

115.    Defendant Big Homie CC then turned the gun back on Defendant Diddy. Plaintiff, not far behind Defendant Big Homie CC , tried to grab Defendant Big Homie CC's hand that had the gun. The gun then went off and hit a hill behind Defendant Shane's residence.

116.    Defendant Diddy then ran up the back stone stairs, near the hill in the backyard, towards where Defendants KK, Shane and Brandi were. Plaintiff charged

towards Defendant Diddy moving the concealed knife from her left hand to her right hand and in pursuit of Defendant Diddy.

117.    Plaintiff then pushed Defendant Diddy from behind, while on the stone stairs outside, causing him to fall with his back to Plaintiff.

118.    Plaintiff then raised the knife, in a rage from the events that just transpired and with the intent of driving the knife into Defendant Diddy's back, when he turned around and began pleading for his life.

119.    Plaintiff, shocked now to see Defendant Diddy acting as a victim had a moment of clarity and then turned and ran down the outdoor stone staircase back out to the backyard to escape.

120.    Defendant Diddy then chased Plaintiff down the stairs and attempted to push her but she was already at the bottom of the stairs and gained her footing and wielded the knife at Defendant Diddy grazing his abdomen.

121.    Hearing the commotion, Defendants KK and Brandi emerged and Defendant KK then began administering first aid to Defendant Diddy for the injuries caused by Plaintiff.

122.    Plaintiff, tried to make quick dash for the exit but it was thwarted by another Defendant Doe. After a period of time, Plaintiff was able to abscond from Defendant Doe due to the first aid commotion with Defendant Diddy and was able to run down the street.

123.    Once Plaintiff made it on to the street she began yelling loudly for someone to call the police.

124.    Defendant Doe, who had now caught up with Plaintiff, advised Plaintiff that he was an undercover cop. To this day Plaintiff is unsure of the truth or falsity of that statement.

125.    The same neighbor then again emerged from his residence asking what was transpiring. Just as Plaintiff was attempting to answer, gun shots began being fired in Plaintiff's direction.

126.    Plaintiff fled to a car near where the neighbor was also taking cover and lost sight of Defendant Doe.

127.    Plaintiff then heard a SUV screeching and speeding leaving the residence.

128.    Plaintiff then entered the home of the neighbor who informed her that he had already called police.

129.    Plaintiff informed the neighbor that it was Sean Combs who had raped her and shot at them but the neighbor was unaware who Defendant Diddy was.

130.    Shortly thereafter a Sheriff from the Contra Costa Sheriff's Department arrived at the neighbor's home.

131.    Plaintiff identified the person who arrived at the neighbor's home posing as a Contra Costa Sheriff was Defendant Pelletier.

1

2

3

4

132.      Plaintiff told Defendant Pelletier, believing he was a Sheriff from local

police, she had been violently gang raped by Defendant Diddy and others and that

she did not have her clothes, phone, purse, car keys or cell phone.

5

6

7

8

9

10

11

12

13

133.      Defendant Pelletier, falsely posing as a Contra Costa Sheriff, told Plaintiff

and the neighbor that they had received several noise complaints prior to the

neighbor's call and instructed Plaintiff to find a way to get home. The "Sheriff,"

Defendant Pelletier, did not offer to take Plaintiff home, nor did he call for

emergency services including an ambulance, nor any offer to take Plaintiff to the

hospital, nor any offer to help Plaintiff recover her clothes or effects from Defendant

Shane's residence.

14

15

16

134.      The Contra Costa Sheriffs have confirmed that a police report was made that

night by Plaintiff Parham.

17

18

19

20

135.      The Contra Costa Sheriffs have refused to release any information related to

the complaint on the night in question to any source despite numerous attempts

made via Freedom of Information Act.

21

22

23

24

25

26

136.      Plaintiff observed Defendant Pelletier hand something to the neighbor, what

looked to be an envelope, at the door as Defendant Pelletier exited. The neighbor

went to a nearby room and quickly returned empty-handed. Plaintiff believes the

envelope contained cash.

27

28

137.      The neighbor offered to let Plaintiff sleep on his couch until she could figure

out a way to get her possessions and get home, but Plaintiff declined, uneasy and

unsure about the exchange with police and the neighbor and police, and only remained at the neighbor's residence for a short period of time once Defendant Pelletier, posing as Contra Costa law enforcement, left.

138.    Plaintiff then went back to Defendant Shane's residence where she found the door open and her clothes were readily accessible in his residence.

139.    Defendant Shane then emerged as if nothing had transpired and offered for Plaintiff to stay at his residence while she "slept it off."

140.    Plaintiff asked for her purse and her keys but Defendant Shane told her she shouldn't leave in her condition and Plaintiff, catatonic and in the state of shock and disbelief of the events that transpired, stayed at Defendant Shane's home while Defendant Shane left the home.

141.    Later that morning, Defendant Shane returned to the residence and woke Plaintiff up and finally gave her back her purse, cell phone and keys and Plaintiff left Defendant's residence.

142.    In a daze, Plaintiff returned home and tried to make sense out of what happened to her.

143.    On March 26, 2018, Plaintiff contacted her primary care doctor and asked for an HIV and STD test in fear of possibly having contracted a disease from her violent rape.

144.    Plaintiff tried to continue her life as she felt she wouldn't be believed as Plaintiff already had told what she believed to be Contra Costa Sheriffs Defendant Diddy raped her to no avail. Further, Plaintiff was under the impression if she did continue to say Defendant Diddy's name in relation to her assault she would not be believed and her family would be in danger.

145.    Seemingly mere days, maybe even the day before Plaintiff's vicious rape, Defendant Shane had miraculously began driving a new car. Plaintiff believes this was payment by Defendant Diddy for setting up Plaintiff to be raped.

146.    Plaintiff went to the hospital where the hospital conducted several tests on Plaintiff including a rape kit, ultrasound and x-rays. Additionally, Plaintiff was given IV fluids to stabilize her vitals as she was in a severe weakened state from being unable to eat and losing a substantial amount of weight since the rape occurred.

147.    While at the hospital, Plaintiff told members of her treatment team about her horrific assault and they then contacted the Walnut Creek Police.

148.    Walnut Creek Police showed up to Plaintiff's hospital room and took a statement regarding her assault. Plaintiff only told Walnut Creek Police about the assault from Defendants Shane and Doe.

149.    Plaintiff believes her statements made to Walnut Creek police, while at the hospital, was captured by police body camera footage.

150.     Plaintiff further believes her statements made on March 23rd immediately after the vicious assault, where Plaintiff named Defendant Diddy directly and by name, may be captured by body camera footage but upon determining the Sheriff was Defendant Pelletier does not believe it was captured as he was a co-conspirator.

151.     Plaintiff filed a report to the Orinda Police Department on April 17, 2018, but was too afraid to name Defendant Diddy as one of her assailants. During this report Plaintiff provided her clothing to the police from the night of the assault but they only retained her underwear. To date, the underwear was never returned and Plaintiff believes no investigation ever commenced.

152.     Plaintiff sought assistance from therapists in May 2018, one of which tried to have her therapy appointments covered by a victim's compensation fund which was rejected because Plaintiff was told no law enforcement agency had opened an active investigation into any of her many reports of her violent gang rape.

153.     Subsequently thereafter, Plaintiff asked police for a copy of her report from the Walnut Creek Police Department. On July 19, 2018, Plaintiff was provided a letter from the Walnut Creek Police Department stating that it was "unable to furnish this information as it is confidential and not subject to public release" despite Plaintiff not being the public and the victim/complainant.

154.     In March 2024, Plaintiff was retraumatized by all of the events surrounding Defendant Diddy including the several civil complaints filed against him as well as the raid on Defendant Diddy's California and Florida residences.

155.    Plaintiff called Contra Costa Sheriff's again in hopes of renewing her previous complaint and amending it to ensure Defendant Diddy's name was included. Plaintiff received no response from the Sheriff.

156.    Plaintiff, in July 2024, then emailed the Chief of the Sheriff's office regarding her complaint, lack of investigation and how she was treated by the initial responding officer. Plaintiff, then later received a call back from a Detective but then nothing further.

157.    Plaintiff then began seeking legal counsel for her claims ultimately being referred to undersign for representation.

158.    Undersign counsel also attempted to get a copy of the 2018 police report from Contra Costa Sheriff's but was told that they would not provide the report or any other information without a subpoena.

**(Plaintiffs John and Jane Does)**

159.    Plaintiffs John and Jane Does are mother and son.

160.    Plaintiffs were taken from their Las Vegas residence by Defendant Pelletier as they walked to their vehicle.

161.    Defendant Pelletier put a gun to Plaintiff John Doe's back and instructed him to get into a black SUV regarding extraditing Plaintiffs for warrants to California.

162.    Plaintiffs did not have any warrants, nor convictions. Plaintiffs demanded to be shown the warrants and Defendant Pelletier refused and threatened to shoot Plaintiffs if they protested further.

163.    In the back of the black SUV was Defendant Valdez. Defendant was unknown to Plaintiffs at the time. Defendant was dressed in dark clothes and instructed Plaintiffs not to look at him.

164.    Plaintiffs were then transported to what they believe was Defendant Pelletier's residence at ███████ Bay St., Las Vegas.

165.    Plaintiffs were ordered inside and brought into the living room and forced to sit on the couch and were physically restrained.

166.    Plaintiffs demanded to speak to their attorney which was refused, ignored or met with threats of violence. It became obvious to Plaintiffs that this was not a legal arrest, and that Pelletier was acting outside of color of law.

167.    At some point thereafter Plaintiffs were ordered back of a large black SUV.

168.    Defendant Gonzalez was given the keys to Plaintiffs vehicle, a SUV, to follow behind the SUV.

169.    Defendants Gonzalez and Pelletier had a list, which upon information and belief was a list of "safe houses" which they could allow parties a safe respite, undetected.

170.     Defendant Pelletier appeared to be in charge and he and Defendant Valdez were both giving out orders to the other co-conspirator Defendants.

171.     Plaintiffs overhear repeated conversations, in the vehicle while being kidnapped and transported, about "following protocol" made by Defendant Pelletier to others.

172.     Upon information and belief, this "protocol" was agreed upon codes, including the use of communication apps like WhatsApp and/or SnapChat, satellite phones and referring to other co-conspirator Defendants by their middle names.

173.     It was apparent to Plaintiffs this was a professional operation/syndicate.

174.     Plaintiffs were then trafficked from Las Vegas, NV to various locations throughout California.

175.     The first location Plaintiffs were able to identify was in Danville, CA.

176.     In the convoy with the SUV Plaintiffs were placed in also included Plaintiffs SUV that was driven by Defendant Gonzalez.

177.     Upon information and belief, Defendant KK was in another SUV part of the convoy.

178.     At some point Defendant Gonzalez complained he had trouble keeping up with the convoy of black SUVs because the SUV ran poorly.

179.    Plaintiffs allege the convoy drive was for numerous hours but the exact time was uncertain as they were unable to keep adequate track of time.

180.    The next location Plaintiffs were taken among the "safe houses" on their route to an unknown destination was ███████████ Way, Danville, CA 94506.

181.    Plaintiffs heard some altercation with the owners of the home not wanting to be involved with Defendants scheme. Plaintiffs attempted to plead to the owners for help and could not understand why they wouldn't heed Plaintiffs cries for help.

182.    Plaintiffs heard the owners speak a foreign language which they believe was Farsi.

183.    Upon information and belief, this location was approximately twenty miles from the home in Orinda where Plaintiff Parham was assaulted.

184.    During the transportation of Plaintiffs across state lines, they were given water to drink, which Plaintiffs believe was drugged. Defendant Valdez would provide Plaintiffs the water which after drinking Plaintiffs would feel slightly euphoric, dizzy and then sick.

185.    Defendant Valdez would demand Plaintiffs drink the water but they refused and/or faked consumption.

186.    During the transportation Plaintiffs were forced to listen to a device with music similar to a device associated with Defendant KK's nonprofit organization MusicBeatsHearts, in order to prevent Plaintiffs from eavesdropping on the

Defendants conversations. At certain times the music stopped playing and Plaintiff John Doe was able to get the ear buds partially out of one ear, without Defendants noticing, to hear conversations about the plans they had for Plaintiffs.

187.    Plaintiffs were then taken to another location at ███████████ Blvd., El Cerrito, CA 94530.

188.    Plaintiffs were able to keep track of their location by remembering cross streets when they were finally let out of the vehicle for stops.

189.    At this location Plaintiffs observed a RV (recreational vehicle) arrive at the residence.

190.    During this stop is when Plaintiffs noticed Defendant KK was a part of the convoy.

191.    At this stop, Plaintiffs overheard Defendant KK, being referred to as her code name, believed to be her middle name Natasha, discussing visiting the UC Berkley campus as Defendant seemed very familiar with the area and familiar with the city.

192.    Upon information and belief, this location was approximately seven miles from the home in Orinda where Plaintiffs were assaulted.

193.    Plaintiffs were then taken to another location at The Beacon Grand Hotel (Sir Francis Drake).

194.    Defendant Shane worked at the hotel as a manager.

195.    Plaintiffs were taken into the hotel through what appeared to be the side entrance, by Defendants Valdez, Pelletier and Gonzalez.

196.    Defendant Pelletier told the co-conspirator Defendants he would stay at a different hotel nearby, so it wouldn't be linked to him.

197.    Once inside the hotel room, Plaintiffs were beaten and drugged by Defendants Valdez and Gonzalez. Plaintiffs pleaded with Valdez and Gonzalez to be released and for mercy.

198.    Defendants Valdez and Gonzalez instructed Plaintiffs to sign paperwork, at gun point. When Plaintiffs refused Defendant Gonzalez would pistol whip Plaintiffs on the back of their heads.

199.    Defendant Gonzalez eventually gave Plaintiffs a drink which caused them to pass out.

200.    Plaintiffs spent the night at the hotel with Defendants Gonzalez and Valdez, taking turns watching them.

201.    The next morning, Plaintiffs were restrained and bound by their hands in front and were placed into a vehicle. Plaintiffs then saw Defendants Jaguar and Helena.

202.    Upon information and belief, Defendants Jaguar and Helena were in a small sedan, light color, white or beige.

203.     Plaintiffs were then transported to the location of Plaintiff Parham's brutal assault on Loma Vista Drive by Defendants Jaguar and Helena.

204.     Defendant Helena was the driver and Defendant Jaguar was the passenger.

205.     Defendant Helena warned Plaintiffs if they tried to escape or run that she would "have to shoot you."

206.     Defendant Helena also warned Plaintiffs not to throw up her vehicle, saying "you better not throw up in my car or get sick."

207.     Defendant Helena mentioned having two partners as backup who were bounty hunters.

208.     Plaintiffs were familiar with Defendant Helena as she had filed a lawsuit against superstar singer Michael Jackson in 2005 and filed a creditors claim against the Jackson estate upon his untimely demise in 2009.

209.     Plaintiffs were familiar with Defendant Helena from her previous Michael Jackson lawsuits and had previously met with Defendant at her home in West Hollywood to determine the credibility of her claims and if they were similar in nature to Plaintiffs.

210.     Plaintiffs had reported Defendant Helena multiple times to the LA and OC FBI field offices, for her role in the crime syndicate with Defendants Pelletier, Valdez and other individuals.

211.    Plaintiffs attempted to make conversation with Defendant Helena in which she admitted she was the same person who Plaintiffs had met with previously.

212.    Defendant Jaguar, aggravated, stated "You let them know who you are? That's really great."

213.    Plaintiffs noticed Defendants had large brown bags and manila envelopes full of cash that was banded. It appeared they were separating the large sums of cash to distribute as they were placing cash into the manila envelopes.

214.    Defendant Jaguar discussed with Defendant Helena how the parties started the first black owned network. Upon information and belief, Plaintiffs believe that network to be Revolt TV.

215.    Defendant Jaguar and Defendant Helena discussed the other co-conspirators but referred to them by their middle names Natasha (Defendant KK),  Pedro (Defendant Gonzalez), Lira (Defendant Valdez), Cornelius (Defendant Odell) and Larry shortened for Lawrence (Defendant Pelletier).

216.    When Defendant Jaguar said Cornelius it upset Defendant Helena who said that Defendants Odell and Druski were her clients, and nothing better happen to them, and Plaintiffs better not say anything about them, or she would have Plaintiffs killed.

217.    Defendant Jaguar then told Plaintiffs they were being taken to meet John. Plaintiffs now know that was referring to Defendant Diddy.

218.     When Defendants arrived with Plaintiffs at the Loma Vista location it appeared as they were waiting and coordinating for others to arrive.

219.     A large sedan arrived and Plaintiffs were were placed in the back with Defendant Valdez. Defendant Pelletier was driving.

220.     Plaintiffs then arrived at a short driveway / curb.

221.     Plaintiff  remembers looking for intersecting street sign at this location and found ██████, a dead-end street off of Loma Vista Drive. Plaintiff John Doe repeated the name of the street to himself so he remembered and was able to whisper into Jane Doe's ear to remember the intersecting street name, ██████.

222.     Plaintiffs believed this was the home they would be murdered in and tried to devise a plan for escape.

223.     Plaintiffs were brought into the house and into the kitchen where they were watched by Defendant Gonzalez.

224.     Plaintiffs repeated their pleas to Defendant Gonzalez to be released and for mercy which he replied, "there's nothing [he] can do."

225.     Plaintiffs could hear other people inside the home, and tried to listen to understand what was happening which included a woman's scream.

226.     Eventually, Plaintiffs were lead deeper into the home where they encountered more individuals including Defendant Diddy.

227.    Plaintiffs observed several individuals gathered around a bed while Defendants Gonzalez and Valdez stood outer guard.

228.    Plaintiffs observed Defendants Jaguar and Helena enter the residence.

229.    Defendant Jaguar told Plaintiffs, "He wants something you have. If I were you, I'd figure out what it is really fast." The "he" Defendant was referring to is believed to be Defendant Diddy.

230.    Shortly after, Defendant Druski appeared wearing a vest and shorts, and he engaged in conversation with Plaintiffs. Plaintiffs tried to appeal to Defendant by talking about the music industry and Defendant instructed Plaintiffs that they should cooperate.

231.    Plaintiffs describe what they observed during the assault of Plaintiff Parham after this interaction with Defendant Druski.

232.    Plaintiffs observed Plaintiff Parham having an IUD forcefully placed in her vagina by Defendants KK with the assistance of Defendant Brandi.

233.    Plaintiffs heard Defendant KK make a remark about how Plaintiff Jane Doe would not need an IUD because of her age.

234.    While hearing Plaintiff Parham scream in agony during the forced IUD insertion Plaintiff Jane Doe yelled "stop hurting her!"

235.    Plaintiffs observed Defendant Shane place a pillow over Plaintiff Parham's face suffocating her and Plaintiff Jane Doe yelled for them to stop or that she would

die. Plaintiff Jane Doe believes Plaintiff Parham did lose consciousness because she became limp and unresponsive.

236.     Defendant Diddy instructed Defendant Valdez to "shut her up," and Defendant Valdez hit Plaintiff Jane Doe with the handle of his firearm.

237.     Plaintiff John Doe witnessed Plaintiff Parham being assaulted by the remote and when he tried to say something Plaintiff was told to shut up or they would put the remote in him next.

238.     Plaintiff John Doe believes he heard Defendant Jaguar make remarks, "Put that remote in her!", "She's going to learn today!" and telling Plaintiff Parham that she was "going to make it worse!"

239.     Plaintiffs believe the remote assault was to punish Plaintiff Parham for the IUD failure.

240.     Plaintiffs heard Defendant KK remark to Defendants Diddy and Druski that she needed to keep them sufficiently drugged and revealed a bag full of drugs and paraphernalia. Defendant KK appeared to be disbursing 'doses' to Defendants asking them their weights to administer the proper amount.

241.     At some point Plaintiff John Doe was taken to the bathroom. While in the bathroom he believed there may have been other tenants and began to bang on the walls hoping someone would hear him but the only person who heard him was Defendants Valdez and Gonzalez who were outside keeping watch.

242.     Upon Plaintiff John Doe's return he saw Defendant Odell.

243.     Plaintiff John Doe took immediate notice of Defendant Odell because when he took his clothes off Plaintiff remembers Defendant being in great shape, especially in comparison to the naked bodies of Defendants Diddy and Druski.

244.     Plaintiff John Doe overheard Defendant Diddy and Odell discussing business and the plan to have Plaintiff Parham return to New York with Defendant Odell.

245.     Plaintiff John Doe could not readily observe where Plaintiff Jane Doe was during this time.

246.     While during this time where Plaintiff Jane Doe was out of the sight of Plaintiff John Doe, Plaintiff Jane Doe was being sexually assaulted by Defendant Valdez in another room.

247.     Plaintiff John Doe witnessed the gang rape of Plaintiff Parham.

248.     Plaintiff Jane Doe witnessed the gang rape of Plaintiff Parham.

249.     Plaintiff John Doe witnessed Defendant Druski douse Plaintiff Parham in baby oil and then jumped and slid across her body.

250.     Plaintiff John Doe observed Defendants Diddy and Druski manically and hysterically laughing, which Plaintiff attributed to their drug use.

251.     Defendant Diddy then attempted to force Plaintiff John Doe to also assault Plaintiff Parham and he refused.

252.     Defendant Diddy instructed Defendant co-conspirators to throw Plaintiff John Doe into the wall several times in order to get him to comply with his demand to rape Plaintiff Parham, which he would not comply.

253.     Defendant Diddy instructed Defendant co-conspirators to yank, grab and pull

at Plaintiff John Doe's genitals violently in an effort to punish him for not

participating in the gang rape of Plaintiff Parham. Plaintiff John Doe remembers

Defendant Big Homie CC saying he was going to look for pliers to use to further

torture Plaintiff.

254.    Plaintiff John Doe believes Defendant Diddy wanted Plaintiff to rape

Plaintiff Parham so they could frame him in the event Plaintiff Parham reported her

assault.

255.    In an effort to get DNA from Plaintiff John Doe to place on Plaintiff Parham,

Defendant Diddy had one of the Defendant co-conspirators orally copulate Plaintiff

John Doe to get semen from him but it failed.

256.    Plaintiff Jane Doe observed Defendant KK return to the room to check on

Plaintiff Parham and providing her an IV telling her to "breathe deeply."

257.    Plaintiff John Doe watched Plaintiff Parham lose consciousness.

258.    At some point Plaintiff Jane Doe returns after Defendants Diddy, Shane,

Druski, Odell, KK and others leave the home and retire to either the backyard or to

the upstairs patio. Plaintiffs were left alone and unattended with an unconscious

Plaintiff Parham.

259.    Plaintiffs were crying after observing the assault upon Plaintiff Parham and

began to realize this was their next chance to devise a plan for escape.

260.    Plaintiffs began looking for weapons and exit points to make their escape.

261.    Plaintiffs could not find any phones or any weapons, like knives in the

kitchen as it appeared all the cutlery and silverware had been removed from the

home.

262.     Plaintiffs were trying to act quickly while the Defendants left them

unattended and were outside smoking, drinking and loudly laughing as if having a

party.

263.     Plaintiffs observed others outside believed to be Defendant Diddy's sons

Christian and Quincy. Plaintiffs observed them "roughhousing" and practicing lay-

up/ basketball moves.

264.     Plaintiffs heard Defendant Diddy tell his sons to watch the gate and make

sure no one left.

265.     Plaintiffs observed Defendant Gonzalez outside the front door where the

front door was barricaded by yellow "crime scene" like tape. The door lock was

unusal because it was facing backwards, needing the key to exit.

266.     Fearing no way to escape, Plaintiff Jane Doe mentioned to Plaintiff John Doe

that she overheard them say "put it on top of the refrigerator" and instructed

Plaintiff John Doe to check to see if there was anything on top of the refrigerator.

267.     Plaintiff John Doe found a knife on top of the refrigerator in the kitchen.

268.     Plaintiffs then heard ramblings from the room Plaintiff Parham was in and

went in to check on her and to stop her from making too much noise that could

thwart their escape plan.

269.     Plaintiffs told Plaintiff Parham they "weren't going to hurt her," and that they

were "here to help." Plaintiff Parham, just now coming into consciousness and being

horrifically gang raped, was upset, terrified and unsure if Plaintiffs were trying to

help or were also co-conspirators.

270.    Plaintiffs eventually were able to get Plaintiff Parham to calm down and listen to their escape plan.

271.    Plaintiffs told Plaintiff Parham they could not find an exit to escape and needed her help to escape otherwise they would all be killed.

272.    Plaintiff Parham, after experiencing her ordeal with Defendants, believed Plaintiffs and agreed to help in an escape.

273.    Plaintiffs told Plaintiff Parham they had found a knife and that her assailants were in the backyard which was believed to be the best exit for escape.

274.    Plaintiff Parham then exited the home with the knife concealed to the backyard.

275.    Shortly thereafter, Defendant KK returned and took Plaintiff Jane Doe to the balcony, leaving Plaintiff John Doe alone in the residence. Plaintiffs believed Defendant KK did not check the residence because she believed Plaintiff Parham was still unconscious.

276.    While on the balcony, Defendant KK demanded Plaintiff Jane Doe sign documents. When Plaintiff refused Defendant yelled, to at least two Doe bodyguards, Plaintiff would not sign and asked them to assist.

277.    Plaintiffs believe the documents were related to creditors claims Plaintiffs had against the Michael Jackson estate.

278.    During this interaction parties hear a gunshot which causes everyone to run towards the backyard where the shot came from.

279.     Plaintiff John Doe, who was left alone and unattended, was able to reach the

stairs where he saw Plaintiff Parham with the knife looking as if she was about to

stab Defendant Diddy and he yelled out "do it, stab him!" but he saw Plaintiff

Parham hesitate.

280.     Plaintiff John Doe observed Defendant Diddy push Plaintiff Parham down at

the bottom of the stairs and Plaintiff John Doe believes he assisted her up.

281.     Plaintiffs were briefly then reunited and Plaintiff John Doe told Plaintiff Jane

Doe now was their opportunity to escape.

282.     Following Plaintiff Parham, Plaintiffs ran out the back gate onto the street

and in the opposite direction of Plaintiff Parham.

283.     Plaintiffs arrived at the house next door to the residence and banged on the

door and yelled for help. The wife came out and said that she and her husband

couldn't help. Plaintiffs found the exchange bizarre and could not understand why

they would not help or call 911.

284.     Plaintiffs were able to then try to hide until they saw an officer report to the

location where they attempted to speak with the officer.

285.     Before Plaintiffs were able to speak to the local officer Defendant Pelletier

appeared and obstructed Plaintiffs from speaking to the responding officer telling

the responding officer a Federal investigation was ongoing and not to interfere.

286.     Defendant Pelletier told the officer to turn off his body camera. Defendant

Pelletier told the officer he was working on a case for drug trafficking and had the

house under surveillance and would report later to the local precinct. Defendant

Pelletier referred to Plaintiffs and Plaintiff Parham as suspects and said they were homeless.

287.    When Plaintiffs tried to refute these statements by Defendant Pelletier they were threatened and told to shut up and remain quiet.

288.    Defendant Gonzalez then transports and removes Plaintiffs from the interaction with Defendant Pelletier and the responding officer.

289.    Defendant Gonzalez placed Plaintiffs in another vehicle, which was hard to see due to the darkness.

290.    Plaintiff Jane Doe pleaded with Defendant Gonzalez to let them go and that she would not tell. In a last-ditch effort, Plaintiff told Defendant she overheard Defendants Jaguar and Helena say they were not going to pay him and that there was not enough money for him.

291.    Unbeknownst to Plaintiffs, Defendants Jaguar and Helena were in a nearby vehicle.

292.    Defendant Gonzalez exited the vehicle and went to the vehicle with Defendants Jaguar and Helena and confronted them about what Plaintiff Jane Doe said.

293.    Defendant Gonzalez returned to the vehicle where Plaintiffs were being held, seemingly confirming what Plaintiff Jane Doe said because Plaintiffs heard him use the Spanish term "mayate" which is often used as a slur towards black people.

294.    Defendant Gonzalez then walked Plaintiffs to a nearby street where the SUV was parked and gave Plaintiffs the keys to the vehicle and released them.

295.    Plaintiffs then arrived at ███████, the main road that leads to the I-24 freeway, and asked another commuter the nearest police station as Plaintiffs did not have any phones and their vehicle did not have GPS. They were given instructions they were close and how to proceed to the police station.

296.    Plaintiffs arrived at the police station at 22 Orinda Way, Orinda CA 94563.

297.    Plaintiff John Doe walked in the police station with the intention of filing a police report but remembered overhearing conversation from the Defendants during their transport, when Defendants believed he could not hear them, that if Plaintiffs ever reported the incident they would be deemed crazy and non-believable.

298.    Plaintiff John Doe was also concerned about the exchange with the responding officer on the scene and how he refused to listen to his pleas then.

299.    Plaintiff John Doe then only briefly spoke to someone at the front desk about filing a report and took a business card.

## FIRST CAUSE OF ACTION
## VIOLATION OF 18 U.S.C. §§ 1962(c), 1964(c) – RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)
### *(Plaintiffs Against All Defendants)*

300.    Plaintiffs incorporate by reference and reallege each of the preceding paragraphs and all paragraphs below as though fully set forth and brought in this cause of action.

301.    Defendants, as well as others known and unknown, are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the Diddy Sexual Abuse and Cover Up Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

302.    The Diddy Sexual Abuse and Cover Up Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of: (i) Defendants, including each of their employees and agents; and (ii) the Diddy Sexual Abuse and Cover Up Enterprise Participants, including but not limited to the Defendants enumerated herein.

303.    As set forth above, the Diddy Sexual Abuse and Cover Up Enterprise was designed and used as a tool to enable Defendant Diddy and the Diddy Sexual Abuse and Cover Up Enterprise Participants to participate in a pattern of racketeering activity.

304.    Section 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of suit, including a reasonable attorney's fee." 18 U.S.C. § 1964.

305.    The Diddy Sexual Abuse and Cover Up Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of: (i) endorsing and facilitating Diddy's sexual harassment, assault and abuse of others, including Plaintiff, (ii) threatening and misleading Defendant Diddy's victims to prevent the reporting, disclosure, or prosecution of his sexual acts, and (iii) intervening in Plaintiff's efforts to report by concealing and refusing to report Defendant Diddy's sexual offenses to the appropriate authorities, including law enforcement.

306.     Defendants have conducted and participated in the affairs of the Diddy Sexual Abuse and Cover Up Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of obtaining a victim for the purpose of committing or attempting to commit aggravated sexual abuse in violation of 18 U.S.C. §§ 1590 as described above, facilitating and financially benefitting from forced labor and sex trafficking in violation of 18 U.S.C. §§ 1589 (a), 1595(a), and instances of transporting individuals, specifically Plaintiffs in the instant case, for the purposes of furthering the common purposes of the Diddy Sexual Abuse and Cover Up Enterprise, including sexual abuse, sexually illicit photography/videography, and other immoral purposes in violation of 18 U.S.C. § 2421, also known as the Mann Act.

307.     The Diddy Sexual Abuse and Cover Up Enterprise engaged in and affected interstate commerce, where Defendants utilized phone lines to make arrangements for Defendant Diddy to further his illicit sexual activities.

308.     Each participant in the Diddy Sexual Abuse and Cover Up Enterprise had a systemic linkage to each other participant through personal relationships and employment relationships and functioned as a continuing unit for the purpose of furthering the scheme and their common purposes.

309.     Defendants, upon information and belief, also used the internet and other electronic facilities to carry out the scheme and conceal the ongoing sexual and fraudulent activities taking place within the Diddy Sexual Abuse and Cover Up Enterprise.

310.    The wire transmissions described herein were made in furtherance of Defendants' scheme and common purpose.

311.    Defendants' scheme and the above-described racketeering activities amounted to a common course of conduct intended to cause Plaintiffs and others to hide and conceal Defendant Diddy's abuse. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs. Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiffs.

312.    The pattern of racketeering activity alleged herein and the Diddy Sexual Abuse and Cover Up Enterprise are separate and distinct from each other. Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the Diddy Sexual Abuse and Cover Up Enterprise.

313.    Defendant Diddy and the Diddy Sexual Abuse and Cover Up Enterprise created and perpetuated a toxic culture that allowed Defendant Diddy's abuse to flourish.

314.    Defendant Diddy had extensive power and influence on others due to his prominent status as a mogul, his fame and notoriety.

315.    Defendant Diddy had command. Defendant Diddy had means, access and influence to provide individuals with a career in the entertainment industry, and

other industries, through his dominate stature in the entertainment industry and connections afforded him due to his fame and notoriety.

316.     Defendant Diddy had authority. Defendant Diddy at all times was a mogul and billionaire who cultivated relationships with some of the most influential individuals through his highly sought after parties and notoriety in the music industry.

317.     Defendant Diddy had control. Defendant Diddy controlled who did what, when and how within his circle of friends and employees including Defendants named herein. If Defendants failed to comply with covering up Defendant Diddy's sexual abuse and assaults they would be terminated, blackballed or find themselves in legal trouble.

318.     Defendant Diddy had power. Plaintiff Parham attempted to report that it was in fact Defendant Diddy who had assaulted her but instead was met with disregard by the Contra Costa Sheriff's Department. Plaintiff Does attempted to report their kidnapping, assault and Plaintiff Parham's assault was thwarted when Defendant Pelletier intervened with the responding officer.

319.     Defendant Diddy and the Diddy Sexual Abuse and Cover Up Enterprise were designed to manipulate, control, sexually assault and prevent individuals from coming forward.

320.     Defendants knowingly benefited from the Diddy Sexual Abuse and Cover Up Enterprise as they retained employment benefits and other monetary benefits. Specifically, Defendant Shane mysteriously had a brand-new car, upon information

and belief, provided to him by Defendant Diddy in thanks and appreciation of facilitating the sexual assault on Plaintiff. Defendants Pelletier, Valdez, Jaguar and Helena received and handled cash on behalf of the enterprise. Defendants Odell and Druski received benefits related to their celebrity specifically Defendant Druski who had a television show on the Revolt TV network.[3]

321.    Defendants willfully ignored the dangers of Defendant Diddy's conduct and pattern of harassment, sexual assault, abuse and misconduct solely for their own personal economic benefit.

322.    Plaintiffs reports to police were ignored. Others who complained about Defendant Diddy's egregious behavior were ignored until Cassie Ventura sued Defendant Diddy.

323.    Since Ms. Ventura's bravery, countless individuals have come forward and filed complaints regarding sexual abuse at the hands of Defendant Diddy. The chorus of victims and evidence obtained by the U.S. Attorney's Office for the Southern District of New York ultimately led to Defendant Diddy being indicted for RICO violations and sex trafficking, among other charges.

324.    The Diddy Sexual Abuse and Cover Up Enterprise and its members protected Defendant Diddy, therefore allowing Defendant Diddy to continue with sordid and egregious sexual abuse practices, intimidated witnesses and victims from reporting Defendant Diddy's crimes and interfered with investigations concerning his abuse.

---

[3] *Sneakin' in with Druski*, announced by Defendant Diddy in 2021.

Most notably, a video showing Defendant Diddy abusing Ms. Ventura was covered up and sold to him.

325.    In the instant case Defendant Diddy was aided and abetted by his network of employees including Defendants who helped him escape and evade capture by police after Plaintiffs harrowing escape.

326.    Defendants were members of the Diddy Sexual Abuse and Cover Up Enterprise and facilitated, benefited from, had knowledge of or should have known of Defendant Diddy's sexual proclivities and predatory sexual behavior.

327.    Defendants assisted in Defendant Diddy's predatory sexual behavior and proclivities by setting up Plaintiff to be sexually assaulted and raped by Defendant Diddy as well as assisting in covering up the crime thereafter.

328.    Defendants provided Defendant Diddy the means to effectuate his crimes, including carrying the drugs used to disable Plaintiffs as well as the means to escape.

329.    Plaintiffs have been injured in their person by reason of these RICO violations.

330.    By reason of and as a result of Defendants' conduct in furtherance of the Diddy Abuse Enterprise and resulting RICO violations, Plaintiffs have been injured in their person. As detailed above, Plaintiffs have suffered direct and severe damage to their professional and personal wellbeing as a result of the assault and harassment perpetuated by and allowed by Defendants.

331.    Defendant Diddy's assault and Defendants' RICO violations have caused
Plaintiffs to suffer from severe emotional distress including developing an eating
disorder and extreme weight loss causing several hospitalizations as well as
extensive need for therapy.

332.    As a result of Defendants' actions Plaintiffs have continued to experience
fear and anxiety and also sought professional help on numerous occasions since the
egregious assault including several hospitalizations, visits to her personal physician
and therapists.

333.    Specifically, Plaintiffs Does have had to move continuously and have even
petitioned for name changes to protect their identities from being discovered by the
Diddy Abuse Enterprise.

334.    Defendant Diddy's rape, kidnapping and assault and Defendants' RICO
violations have caused Plaintiffs to be fearful, distressed, anxious, degraded, and
depressed. Plaintiffs have gained a global distrust for individuals.

335.    If not but for Defendant Diddy's direct action and the atmosphere cultivated
by him and the Defendants who were members of the Diddy Sexual Abuse and
Cover Up Enterprise, Plaintiffs would not have developed several issues that have
severely impacted their lives and livelihood. Plaintiffs' issues and overall health has
been exacerbated by the ongoing trauma of not being believed. The damage to
Plaintiffs persons is incalculable.

336.    Plaintiff Parham has experienced years of anxiety and depression since the
violent rape and assault that occurred in 2018. Her anxiety and depression was

compounded by the lack of care and complete disregard of her reports to law enforcement. Even when Plaintiff was brave enough to name Defendant Diddy to the police when called immediately after the incident she was dismissed and treated as if she was lying due to the fame and overall public support of Defendant Diddy at the time, which speaks to the wide-spread influence Defendant Diddy had over the general public at large.

337.    Plaintiff Parham has struggled with her inability to reconcile her horrible experience with Defendant Diddy and other members of the Diddy Abuse Enterprise and their outward failure to protect women, as members included women.

338.    Plaintiffs Does live in constant fear and have went through great lengths to protect their lives and identities from discovery of the Diddy Abuse Enterprise. Plaintiffs come forward now because they believe it is safe to do so due to Defendant Diddy's incarceration, charges and upcoming trial as well as in support of Plaintiff Parham.

339.     At all relevant times, all Defendants were aware of the essential nature and scope of the Diddy Sexual Abuse and Cover Up Enterprise and intended to participate in it.

**SECOND CAUSE OF ACTION**
**VIOLATION OF RACKETEER INFLUENCED AND CORRUPT**
**ORGANIZATIONS ACT (RICO) — CONSPIRACY 18 U.S.C. 1962(d)**
*(Plaintiffs Against All Defendants)*

340.    Plaintiffs incorporate by reference and reallege each of the preceding paragraphs and all paragraphs below as though fully set forth and brought in this cause of action.

341.    Each Defendant agreed to commit the substantive racketeering offense through agreeing to participate in racketeering acts.

342.    Each enterprise member agreed to commit the substantive racketeering offense through agreeing to participate in racketeering acts.

343.    Each Defendant knew the general status of the conspiracy was to enable and cover up Defendant Diddy's decades worth of sexual abuses.

344.    Each enterprise member knew the general status of the conspiracy was to enable and cover up Defendant Diddy's decades worth of sexual abuses.

345.    Each Defendant knew the conspiracy extended beyond their individual role.

346.    Each enterprise member knew the conspiracy extended beyond their individual role.

347.    As set forth above, each Defendant agreed and conspired to violate 18 U.S.C. § 1962(c).

348.    Specifically, in an effort to enable, further, protect, aid, secrete, and cover up each of Defendant Diddy's sexual assaults, Defendant Diddy's pattern and practice of sexual assault, kidnapping and abuse, and Defendant Diddy's sexual battery against Plaintiffs, Defendants agreed to engage in each of the predicate offenses identified above.

349.    Defendants knew their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above constituting a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

### THIRD CAUSE OF ACTION
### CIVIL CODE § 1708.5 – SEXUAL BATTERY
*(Plaintiffs Against Defendants Diddy, Shane, Odell, Druski, Valdez)*

350.    Plaintiff incorporates by reference and realleges each of the preceding paragraphs and all paragraphs below as though fully set forth and brought in this cause of action.

351.    Defendants committed acts with the intent to cause a harmful or offensive contact with an intimate part of Plaintiff. The sexually offensive and unwanted contact with Plaintiff directly resulted from Defendants' said acts.

352.    Defendant Diddy exploited his position of authority to intimidate, overwhelm, and subdue Plaintiff's, with the assistance of Defendants Shane, KK, Odell, Brandi and Druski, objections to his conduct would be met with retaliation.

353.    Defendant Diddy abused his position of power and authority over Plaintiff Parham, who was in no position to reject his sexual assault due to her being physically outnumbered, unable to vacate the premises because she was drugged and having her clothes, purse, cell phone and keys hidden from her.

354.    Defendant Diddy abused his position of power and authority over Plaintiff John Doe, who was in no position to reject his sexual assault due to him being

physically outnumbered, unable to vacate the premises because he was drugged and

kidnapped and having his cell phone and keys hidden from him.

355.    Defendant Valdez abused his position of power and authority over Plaintiff

Jane Doe, who was in no position to reject his sexual assault due to her being

physically outnumbered, unable to vacate the premises because she was drugged

and kidnapped and having her cell phone and keys hidden from her.

356.    Defendants Diddy, Shane, Odell and Druski's battery on Plaintiff caused

physical injury, severe mental and emotional distress, pain and suffering, mental

anguish, and loss of enjoyment of life.

357.    Defendants' unlawful actions were intentional, done with malice, and/or

showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights.

358.     Plaintiff claims compensatory and punitive damages herein.

359.    The amount of damages sought herein exceeds the jurisdictional limits of all

other Courts which would otherwise have jurisdiction.

**FOURTH CAUSE OF ACTION**
**CALIFORNIA CIVIL CODE § 340.16 – SEXUAL ASSAULT**
*(Plaintiff Parham Against Defendants Diddy, Shane, Odell, Druski)*

360.    Plaintiff incorporates by reference and realleges each of the preceding

paragraphs and all paragraphs below as though fully set forth and brought in this

cause of action.

361.    Defendants touched an intimate part of Plaintiff, against her will, for sexual

arousal, sexual gratification, or sexual abuse.

362.     Defendants committed an act of sexual penetration against Plaintiff's will by means of force, drugging, violence, duress, menace, or fear of immediate and unlawful bodily injury to Plaintiff.

363.     Defendants' conduct placed Plaintiff in reasonable apprehension of bodily harm.

364.     Defendants' actions caused Plaintiff to fear retaliation in the future and there was a reasonable possibility that Defendants, specifically Defendant Diddy, could execute on a threat of retaliation.

365.     Defendants' assault on Plaintiff caused physical injury, severe mental and emotional distress, pain and suffering, mental anguish, and loss of enjoyment of life.

366.     Defendants' unlawful actions were intentional, done with malice, and/or with a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights.

367.     Defendants conspired to and did engage in a cover up or attempted a cover up of  previous instances or allegations of sexual assault by Defendant Diddy.

368.     Newly enacted CCP 340.16, effective January 1, 2023, is the governing California State Statute extending the statute of limitations and granting revival of a Plaintiff's claims seeking to recover damages suffered as a result of a sexual assault that occurred on Plaintiff.

369.     The amount of damages sought herein exceeds the jurisdictional limits of all other Courts which would otherwise have jurisdiction.

**FIFTH CAUSE OF ACTION**
**CALIFORNIA CIVIL CODE § 51.9 – SEXUAL HARASSMENT**
*(Plaintiff Parham Against Defendants Diddy, Shane, Odell, Druski)*

370.    Plaintiff incorporate by reference and reallege each of the preceding paragraphs and all paragraphs below as though fully set forth and brought in this cause of action.

371.    Defendants made sexual advances, solicitations, sexual requests, demands for sexual compliance by Plaintiff, as well as engaged in other verbal, visual, or physical conduct of a sexual nature or of a hostile nature based on Plaintiff's gender, all of which were unwelcome and pervasive or severe.

372.    Defendants intentionally, recklessly, and wantonly acts resulted in harmful and offensive contact with the intimate parts of Plaintiff's persons.

373.    Defendant Diddy, specifically, used his authority to coerce and exploit Defendant Shane into luring Plaintiff to his home so that Defendant Diddy could physically, psychologically, and/or emotionally through force, manipulation, emotional abuse, intimidation, and retaliation abuse Plaintiff. These acts were done for Defendant Diddy's sexual gratification.

374.    Plaintiff has suffered economic loss or disadvantage and/or personal injury, including but not limited to, emotional distress as a result of Defendants conduct.

375.    As a result of Defendants unlawful conduct, Plaintiff is entitled to actual damages and exemplary damages pursuant to California Civil Code section 52, subdivision (b), in an amount to be awarded at trial.

## SIXTH CAUSE OF ACTION
## BATTERY
*(Plaintiffs Against All Defendants)*

376.     Plaintiffs incorporates by reference and realleges each of the preceding paragraphs and all paragraphs below as though fully set forth and brought in this cause of action.

377.     Defendants intended to commit and committed acts of unwanted contact with Plaintiffs.

378.     Defendants Diddy, Shane, Odell and Druski committed unwanted contact with Plaintiff Parham in a harmful and offensive manner, including but not limited to by inflicting sexual abuse against Plaintiff.

379.     Among other batteries, Defendants KK and Brandi abused Plaintiff Parham without her consent and without equality.

380.     Defendants Pelletier, Gonzalez, Valdez, Helena and Jaguar committed unwanted contact with Plaintiffs Does in a harmful and offensive manner, including but not limited to by inflicting severe physical abuse against Plaintiffs.

381.     Defendants Diddy, committed unwanted contact with Plaintiff John Doe in a harmful and offensive manner, including but not limited to by inflicting sexual abuse against Plaintiff.

382.     Defendant Diddy exploited his position and status to intimidate, overwhelm, and subdue Plaintiffs. Any objections to his conduct would be met with retaliation not only by Plaintiffs but the other Defendants involved.

383.     Defendant Diddy abused his position of power and influence over Plaintiff Parham and John Doe, who were in no position to reject his sexual advances.

384.    Defendants' batteries on Plaintiffs caused physical injury, severe mental and emotional distress, pain and suffering, mental anguish, and loss of enjoyment of life.

385.    Defendants' unlawful actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiffs' rights.

386.    Plaintiffs claim compensatory and punitive damages herein.

387.    The amount of damages sought herein exceeds the jurisdictional limits of all other Courts which would otherwise have jurisdiction.

### SEVENTH CAUSE OF ACTION
### ASSAULT
*(Plaintiffs Against All Defendants)*

388.    Plaintiffs incorporates by reference and realleges each of the preceding paragraphs and all paragraphs below as though fully set forth and brought in this cause of action.

389.    Defendants intentionally attempted, threatened, and committed harmful and offensive contacts against Plaintiffs, including but not limited to inflicting sexual abuse and physical abuse against Plaintiffs.

390.    Defendants' conduct placed Plaintiffs in reasonable apprehension of bodily harm.

391.    Defendants' assaults on Plaintiffs caused physical injury, severe mental and emotional distress, pain and suffering, mental anguish, and loss of enjoyment of life.

392.    Defendants' unlawful actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiffs' rights.

393.    Plaintiffs' claims compensatory and punitive damages herein.

394.     The amount of damages sought herein exceeds the jurisdictional limits of all

other Courts which would otherwise have jurisdiction.

**EIGHTH CAUSE OF ACTION**
**NEGLIGENCE**
*(Plaintiff Parham Against Defendant Shane)*

395.     Plaintiff incorporate by reference and reallege each of the preceding and all

paragraphs below as though fully set forth and brought in this cause of action.

396.     Defendant Shane invited Plaintiff to his home as a guest. Defendant Shane

owed Plaintiff a right to expect protection from the other Defendants, specifically

Defendant Diddy, while a guest in his home.

397.     As a direct and proximate result of the foregoing negligence, Plaintiff was

sexually harassed, assaulted and abused by Defendants Diddy, Shane and Does 1

and 2, causing Plaintiff bodily injuries, pain and suffering, mental anguish, and loss

of capacity for the enjoyment of life. The losses are either permanent or continuing,

and Plaintiff will suffer losses in the future.

**NINTH CAUSE OF ACTION**
**NEGLIGENT FAILURE TO WARN**
*(Plaintiffs Against Defendants Shane, KK, Pelletier, Gonzalez, Valdez, Odell, Druski, Jaguar, Helena, Brandi, Does)*

398.     Plaintiffs incorporate by reference and reallege each of the preceding and all

paragraphs below as though fully set forth and brought in this cause of action.

399.     Defendants conduct created a risk of physical or emotional harm to Plaintiffs.

400.     Defendants knew and had reason to know that Plaintiffs Parham and John

Doe were at risk of sexual assault and abuse by Defendant Diddy.

401.     Despite the knowledge of the danger in the participation in the Diddy Sexual
Abuse and Cover Up Enterprise, Defendants did not alert Plaintiffs to the risk of
sexual assault, harassment, kidnapping, physical assault, rape, and/or other attacks
by Defendant Diddy. In fact, Defendants facilitated and assisted Defendant Diddy in
his illegal deviant activities and despicable behavior.

402.     Defendant Pelletier represented he was lawfully transporting Plaintiffs Does
for the purpose of outstanding warrants.

403.     Defendant Shane, specifically represented to Plaintiff that she would be safe
while a guest in his home and would be free of risk of attack.

404.     Defendants had reason to know that Plaintiffs would be unaware of the risk
of sexual assault, harassment, kidnapping, physical assault, rape, and/or other
attacks by Defendant Diddy and the Diddy Sexual Abuse and Cover Up Enterprise.

405.     A warning to Plaintiffs by any Defendant that they were at risk of sexual
assault, harassment, kidnapping, physical assault, rape, and/or other attacks by
Defendant Diddy or any other Defendant would have reduced the risk of harm to
Plaintiffs.

406.      As a legal and direct result of the aforementioned conduct and omission of
Defendants, Plaintiffs were sexually assaulted, harassed, kidnapped, physically
assaulted, raped, and/or otherwise attacked and robbed of their dignity and personal
safety. The depraved attacks on Plaintiff caused Plaintiff to suffer serious
psychological and physical harm from which she may never fully recover.

407.     As a direct and legal result of Defendants' Failure to Warn, Plaintiffs

suffered damages, both economic and general, non-economic damages according to

proof.

**TENTH CAUSE OF ACTION**
**NEGLIGENT SUPERVISION AND RETENTION**
*(Plaintiffs Against Defendant Diddy)*

408.     Plaintiffs incorporate by reference and reallege each of the preceding

paragraphs and all paragraphs below as though fully set forth and brought in this

cause of action.

409.     At all times material, Defendants were employed by Defendant Diddy (under

the control and authority of Defendant Diddy).

410.     Defendants were unfit or incompetent and posed a particular risk of sexually

harassing, assaulting, and or mentally abusing Plaintiff.

411.     Defendant Diddy knew or should have known not only that Defendants were

unfit or incompetent and posed a particular risk of sexually harassing, assaulting,

physically and or mentally abusing Plaintiffs, but also that this unfitness created a

particular risk to Plaintiffs.

412.     Defendants' unfitness and particular risk to Plaintiffs harmed Plaintiffs.

413.     Defendant Diddy knew or should have known that Defendants Odell and

Druski had previously engaged and was continuing to engage in unlawful sexual

conduct for his own personal sexual gratification.

414.     Defendant Diddy knew or should have known that it was foreseeable that

Defendants Odell and Druski was engaging, or would engage, in illicit sexual

activities with Plaintiff under the cloak of the authority, confidence, and trust, bestowed upon him through Defendant Diddy.

415.     At no time during the alleged period did Defendant Diddy have in place a reasonable system or procedure to investigate, supervise and monitor Defendants Odell and Druski to prevent sexual and verbal abuse, sexual assault, nor did he implement a system or procedure to oversee or monitor conduct towards individuals they encountered.

416.     Defendant Diddy conspired to and did breach his duties of care owed to Plaintiff, including by turning a blind eye and encouraging known abuses by Defendants Odell and Druski and the known dangerous conditions of the Diddy Sexual Enterprise and by continuing to expose individuals, like Plaintiffs Parham and John Doe, to these dangers for decades.

417.     Even though Defendant Diddy knew or should have known of these sexually illicit activities by himself and Defendants Odell and Druski, he failed to use reasonable care in supervising Defendants Odell and Druski and did nothing to reasonably investigate, supervise or monitor Defendants Odell and Druski to ensure the safety of individuals they encountered.

418.     Defendant Diddy's negligence in supervising and or retaining Defendants Odell and Druski was a substantial factor in causing harm to Plaintiff.

419.     As a result of the above-described conduct, Plaintiffs has expended significant costs on therapy and suffered damages including deprivation of income and benefits, loss of employment opportunities, severe physical and emotional

distress, pain and suffering, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

420.    Plaintiffs claim compensatory and punitive damages herein.

421.    The amount of damages sought herein exceeds the jurisdictional limits of all other Courts which would otherwise have jurisdiction.

<div align="center">

**ELEVENTH CAUSE OF ACTION**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
*(Plaintiffs Against All Defendants)*

</div>

422.    Plaintiffs incorporate by reference and reallege each of the preceding paragraphs and all paragraphs below as though fully set forth and brought in this cause of action.

423.    Defendants conspired to and did engage in conduct that was extreme and outrageous and intentionally caused severe emotional distress to Plaintiffs.

424.    Defendants' conduct exceeded all possible bounds of decency.

425.    Defendants acted with the intent and knowledge that Plaintiffs suffered emotional distress due to their inexcusable and outrageous conduct.

426.    Defendants' conduct caused Plaintiffs to suffer physical injury, severe mental and emotional distress, pain and suffering, mental anguish, and loss of enjoyment of life.

427.    Defendants' unlawful actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiffs' rights.

428.    Plaintiffs' claims compensatory and punitive damages herein.

429.    The amount of damages sought herein exceeds the jurisdictional limits of all

other Courts which would otherwise have jurisdiction.

### TWELFTH CAUSE OF ACTION
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
*(Plaintiffs Against All Defendants)*

430.    Plaintiffs incorporate by reference and reallege each of the preceding

paragraphs and all paragraphs below as though fully set forth and brought in this

cause of action.

431.    Defendants were negligent by both conspiring to and each breaching the duty

of care they owed to Plaintiffs to keep her safe and by breaching their duty to

properly supervise and control Defendants within the Diddy Sexual Abuse and

Cover Up Enterprise.

432.    Plaintiffs suffered physical injuries, severe mental and emotional distress,

pain and suffering, mental anguish, and loss of enjoyment of life.

433.    Defendants' negligence were a substantial factor in causing Plaintiffs to

suffer physical injuries, severe mental and emotional distress, pain and suffering,

mental anguish, and loss of enjoyment of life.

### THIRTEENTH CAUSE OF ACTION
### UNJUST ENRICHMENT
*(Plaintiffs Against Defendants Shane, KK, Pelletier, Valdez, Brandi, Druski, Helena, Odell, Big Homie CC, Jaguar, Does)*

434.    Plaintiffs incorporate by reference and reallege each of the preceding

paragraphs and all paragraphs below as though fully set forth and brought in this

cause of action.

435.    Defendant Shane received significant revenue, specifically a new car, for his betrayal and his involvement in Plaintiff's assault, battery, rape, false imprisonment and his role in the Diddy Sexual Abuse and Cover Up Enterprise.

436.    Defendants Pelletier, Valdez, KK, Brandi, Helena, Jaguar and Does received revenue in the form of cash payment for their involvement in in Plaintiffs Does assault, battery, false imprisonment and his role in the Diddy Sexual Abuse and Cover Up Enterprise.

437.    Other Defendants named herein received significant revenue for their involvement in Plaintiffs assault and their roles in the Diddy Sexual Abuse and Cover Up Enterprise.

438.    Defendants appreciate and have knowledge of such benefits and retain them to this day.

439.     Under principles of equity and good conscience, Defendants should not be permitted to retain the profit they received and retained at Plaintiffs expense while refusing to provide compensation for the injuries suffered by Plaintiffs as a result of their unlawful conduct, including their failure to guard against, educate as to, or otherwise failure to prevent such injuries inflicted on Plaintiffs.

440.    Under principles of equity and good conscience, Defendants should not be permitted to retain the profit they received and retained at Plaintiffs expense while refusing to provide compensation for the injuries suffered by Plaintiffs as a result of their unlawful conduct as members of the Diddy Sexual Abuse and Cover Up Enterprise.

441.     Plaintiffs seek restitution and/or disgorgement of all monies Defendants have

unjustly received and retained as a result of their unlawful conduct and participation

in the Diddy Sexual Abuse and Cover Up Enterprise alleged herein.

**FOURTEENTH CAUSE OF ACTION**
**AIDING AND ABETTING**
*(Plaintiffs Against All Defendants)*

442.     Plaintiffs incorporate by reference and reallege each of the preceding

paragraphs and all paragraphs below as though fully set forth and brought in this

cause of action.

443.     Defendants knew that an assault/battery/sexual assault was being committed

and was going to be committed against Plaintiffs because of Defendants

involvement in the Diddy Sexual Abuse and Cover Up Enterprise.

444.     Defendants provided drugs to be used to take advantage of Plaintiffs without

the knowledge or consent of Plaintiffs.

445.     Defendants knew Plaintiffs have been and would be assaulted because of

their involvement in the Diddy Sexual Abuse and Cover Up Enterprise.

446.     Defendants' conduct was a substantial factor in causing harm to Plaintiffs.

447.     Through the aforementioned acts, Defendants caused Plaintiffs an imminent

apprehension of harmful or offensive contact with an intimate part of Plaintiffs'

body and sexually offensive contact with Plaintiffs resulted.

448.     As a result of Defendants conduct, Plaintiffs have suffered economic injury.

Plaintiffs' general, special, and consequential damages are in an amount to be

proven at trial, but in no event is less than the minimum jurisdictional amount of this Court.

449.    As a result of Defendants above-described conduct, Plaintiffs have suffered and continues to suffer great emotional distress and was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life.

450.    As described in this Complaint, the Defendants conduct was done with oppression, fraud, and/or malice warranting significant damages, including punitive damages.

451.    Here, Plaintiffs were sexually assaulted by Defendants Diddy, Shane, Odell, Druski, Valdez and Doe at Defendant Shane's residence. Plaintiff was legally on the premises as a guest and invitee of Defendant Shane. Defendant Shane (through renting) the premises had dominion and control over the premises where Plaintiff was harmed. Defendant Diddy had dominion and control over the actions of Defendants Shane, Odell, Druski and Doe and failed to step in and stop them from sexually assaulting Plaintiff Parham.

452.    As the owner of the property, Defendant Shane had a duty to protect Plaintiff from the harm she suffered at the hands of Defendants Diddy Odell, Druski and Doe and breached his duty when he failed to stop them from sexually assaulting Plaintiff Parham. In furtherance of this breach, Defendant Shane encouraged Defendant Diddy Odell, Druski and Doe to continue their assault on Plaintiff. Plaintiff has

suffered immensely because of Defendant Shane's intentional breach of his duty to her.

453.    Plaintiffs Does were battered, sexually assaulted and assaulted by Defendants Diddy, Pelletier, Gonzalez and Valdez at Defendant Shane's residence. Plaintiffs were legally on the premises as they were kidnapped and forcefully brought there. Defendant Shane (through renting) the premises had dominion and control over the premises where Plaintiffs were harmed. Defendant Diddy had dominion and control over the actions of Defendants Shane, Odell, Druski, Pelletier, Gonzalez, Valdez and Doe and failed to step in and stop them from assaulting and battering Plaintiffs.

454.    As the owner of the property, Defendant Shane had a duty to protect Plaintiffs from the harm they suffered at the hands of Defendants Diddy, Pelletier, Gonzalez, and Valdez and breached his duty when he failed to stop them from battering and assaulting Plaintiffs Does. In furtherance of this breach, Defendant Shane encouraged Defendants to continue their assault on Plaintiffs. Plaintiffs have suffered immensely because of Defendant Shane's intentional breach of his duty to them.

455.    As a result of breach of his duty, Plaintiffs have suffered and continues to suffer harm, including severe emotional distress, anxiety, and other consequential damages, for which they are entitled to an award of monetary damages and other relief.

456.    Defendants conduct described above was willful, wanton, and malicious. At all relevant times, Defendants acted with conscious disregard for Plaintiffs' rights

and feelings, acted with the knowledge of or with reckless disregard for the fact that

their conduct was certain to cause injury to Plaintiffs, and intended to cause fear,

physical injury and/or pain and suffering to Plaintiffs. By virtue of the foregoing,

Plaintiffs are entitled to recover punitive damages.

### FIFTEENTH CAUSE OF ACTION
### TRAFFICKING AND VICTIMS' PROTECTION ACT
*(Plaintiffs Against All Defendants)*

457.    Plaintiffs incorporate by reference and reallege each of the preceding

paragraphs and all paragraphs below as though fully set forth and brought in this

cause of action.

458.    Defendants knowingly and intentionally participated in, perpetrated, assisted,

supported, and facilitated a sex trafficking venture that was in and affecting

interstate and foreign commerce, together and with others, in violation of 18 U.S.C.

§ 1590

459.    Among other things, Defendants knowingly and intentionally recruited,

enticed, provided, obtained, advertised, and solicited by various means Plaintiffs,

knowing that Defendants would use means of force, threats of force, fraud,

coercion, and a combination of such means to cause Plaintiffs to engage in

nonconsensual sex acts.

460.    Defendants had actual knowledge that they were perpetrating and facilitating

Defendant Diddy's sexual abuse and sex trafficking conspiracy to recruit, solicit,

entice, coerce, harbor, transport, obtain, and provide Plaintiffs into nonconsensual

sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion.

461.    Despite such knowledge, Defendants intentionally paid for, facilitated, perpetrated, and participated in Defendant Diddy's violations of 18 U.S.C. § 1590, which Defendants knew, and were in reckless disregard of the fact that Defendant Diddy would coerce, defraud, and force Plaintiffs to engage in nonconsensual sex acts.

462.    Defendants' actions were in and affecting interstate and foreign commerce.

463.    By taking the concrete steps alleged in this Complaint, Defendants knowingly participated in sex trafficking and furthered the Diddy Sexual Abuse and Cover Up Enterprise. The concrete steps constituted taking part in the sex trafficking venture and were necessary for its success. The concrete steps constituted active engagement by Defendants in the Diddy Sexual Abuse and Cover Up Enterprise. Defendants knew that its active engagement would lead to and cause coercive sex trafficking.

464.    Defendants affirmative conduct was committed knowing, and in reckless disregard of the facts, that Defendant Diddy would use his means and influence to force and intimidate Plaintiff into engaging in nonconsensual sex acts. Defendants' conduct was outrageous and intentional.

465.    Defendants knowing and intentional conduct has caused Plaintiffs serious harm, including, without limitation, physical, psychological, emotional, financial, and reputational harm.

466.    Defendants knowing and intentional conduct has caused Plaintiffs harm that are sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing nonconsensual sexual activity, to avoid incurring further harm.

467.    Defendants criminal conduct in perpetrating TVPA violations was outrageous and intentional because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. Defendants criminal conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Defendants criminal conduct was directed specifically at Plaintiffs, who was the victim of Defendant Diddy's sexual abuse and sex trafficking.

468.    Defendants outrageous and intentional conduct in this case is part of a pattern and practice of profiting by undertaking illegal "high risk, high reward" actions.

469.    By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1590 and 1595, Defendants are liable to Plaintiffs for the damages they sustained, and reasonable attorneys' fees.

470.    By virtue of these intentional and outrageous violations of 18 U.S.C. § 1590 and 1595, Defendants are liable to Plaintiffs.

**SIXTEENTH CAUSE OF ACTION**
**AIDING, ABETTING, AND INDUCING A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS' PROTECTION ACT, 18 U.S.C. §§ 1590 and 1595**
*(Plaintiffs Against All Defendants)*

471.    Plaintiffs incorporate by reference and reallege each of the preceding paragraphs and all paragraphs below as though fully set forth and brought in this cause of action.

472.    Defendants directly committed and perpetrated violations of Chapter 77, Title 18, U.S. Code, including 18 U.S.C. § 1590 by aiding, abetting, and inducing the sex trafficking venture and the sex trafficking of Plaintiffs. Defendants themselves directly violated Chapter 77 by committing and perpetrating these violations.

473.    Among other things, Defendants aided, abetted, and induced Defendant Diddy's sex trafficking venture and sex trafficking of Plaintiffs Parham and John Doe knowing that Defendant Diddy would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Plaintiffs to engage in nonconsensual sex acts.

474.    By aiding, abetting, and inducing Defendant Diddy's sex trafficking venture and sex trafficking of Plaintiffs Parham and John Doe, Defendants benefited, both financially and by receiving things of value, from participating in the Diddy Sexual Abuse and Cover Up Enterprise sex trafficking venture.

475.    Defendants had actual knowledge that they were aiding, abetting, and inducing Defendant Diddy and his co-conspirators' sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain, and provide Plaintiffs into nonconsensual sex acts, through the means of force, threats of force,

fraud, abuse of process, and coercion. Defendants knew, and should have known, that Defendant Diddy had engaged in acts in violation of the TVPA.

476.    Defendants knowing and intentional conduct of aiding, abetting, and inducing Defendant Diddy's violations have caused Plaintiffs serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

477.    Through their unchecked support Defendants aided, abetted, and induced Defendant Diddy's violations and caused Plaintiffs harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing nonconsensual sexual activity, in order to avoid incurring additional harm.

478.    Defendants' criminal conduct in aiding, abetting, and inducing Defendant Diddy's violations of the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous Diddy Sexual Abuse and Cover Up Enterprise and criminal sex trafficking organization. Defendants' criminal conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Defendants criminal conduct was directed specifically at Plaintiffs, who were the victims of Defendant Diddy's sexual abuse and Cover Up sex trafficking organization.

479.    Defendants' outrageous and intentional conduct in this case is part of a pattern and practice of Defendants by profiting by undertaking illegal "high risk, high reward" partnerships.

480.    By virtue of these knowing and intentional violations of 18 U.S.C. § 1590 and 1595, Defendants are liable to Plaintiffs for the damages they sustained and reasonable attorneys' fees.

481.    By virtue of these intentional and outrageous violations of 18 U.S.C. § 1590 and 1595, Defendants are liable to Plaintiffs for punitive damages.

### SEVENTEENTH CAUSE OF ACTION
### KNOWING BENEFICIARY IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS' PROTECTION ACT, 18 U.S.C. §§ 1590 and 1595
*(Plaintiffs Against All Defendants)*

482.    Plaintiffs incorporate by reference and reallege each of the preceding paragraphs and all paragraphs below as though fully set forth and brought in this cause of action.

483.    Upon information and belief, Defendants knowingly and intentionally benefitted, financially and by receiving things of value, from participating in, assisting, supporting, and facilitating an illegal coercive sex trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1590.

484.    Defendants took many concrete steps to aid and participate in Diddy's Sexual Abuse and Cover Up Enterprise sex trafficking venture. Among the concrete steps that Defendants took to aid Defendant Diddy was providing victims to Defendant

Diddy, like Plaintiffs, as well as security, getaway driver, a private location to engage in his debaucheries and drugs used to weaken Plaintiffs defenses making the sex trafficking venture possible.

485.    Upon information and belief, Defendants roles and actions provided were necessary for Defendant Diddy to force Plaintiffs to engage in nonconsensual sex acts.

486.    The financing to the Defendants in the Diddy Sexual Abuse and Cover Up Enterprise directly formed part of the commercial nature of the sex acts. Defendants thusly actively participated in the recruitment of victims of the venture.

487.    Defendants knew or should have known that they were feeding Defendant Diddy's sexual deviancy.

488.    Upon information and belief, Defendants received financial benefits from Defendant Diddy and his sex trafficking venture, most notably a new car for Defendant Shane and cash payments to Defendants KK, Brandi, Pelletier, Gonzalez, Valdez, Odell, Druski and Does.

489.    Defendants knew that it would gain far from routine financial benefits by participating in the Diddy Sexual Abuse and Cover Up Enterprise sex trafficking venture.

490.    By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1590 and 1595, Defendants are liable to Plaintiffs for the damages they sustained and reasonable attorneys' fees.

**EIGHTEENTH CAUSE OF ACTION**
**OBSTRUCTION OF THE ENFORCEMENT OF THE TRAFFICKING VICTIM**
**PROTECTION ACT, 18 U.S.C. § 1590(b)**
*(Plaintiffs Against All Defendants)*

491.    Plaintiffs incorporate by reference and reallege each of the preceding

paragraphs and all paragraphs below as though fully set forth and brought in this

cause of action.

492.    Defendants knowingly and intentionally obstructed, attempted to obstruct,

interfered with, and prevented the enforcement of 18 U.S.C. § 1590 all in violation

of 18 U.S.C. § 1590(b). This activity is hereinafter referred to collectively simply as

"obstruction."

493.    Upon information and belief, Defendants obstruction of the enforcement of

18 U.S.C. § 1590 was forbidden by 18 U.S.C. § 1590(b), thereby violating Chapter

77, Title 18. Defendants' obstruction described here and in the preceding paragraph

directly, proximately, and foreseeably harmed Plaintiffs directly resulting in

Plaintiffs being forced against their will to engage in nonconsensual sex acts.

494.    Upon information and belief, Defendant Diddy has a well-documented

history of criminal investigations. Defendants were on notice of Defendant Diddy's

proclivity to criminal activity. They knew or should have known that Defendant

Diddy's Sexual Abuse and Cover Up Enterprise sex trafficking operation would or

could result in a criminal investigation by State and Federal prosecutors for

violating (among other laws) the TVPA. Defendants should have taken a que from

the Federal Prosecutors arrest and prosecution of Jeffrey Epstein. The U.S.

Attorney's Office for the Southern District of New York indicted Epstein (and

unnamed "associates") for violating the TVPA. Later, the same Office indicted Epstein's co-conspirator, Ghislaine Maxwell, for conspiracy to entice minor victims to travel to be abused by Epstein. All named Defendants in this matter engaged in the same activities as Mr. Epstein and Ms. Maxwell. In fact, Defendants may have done worse.

495.    Upon information and belief, by concealing their actions thereafter, Defendants obstructed, interfered with, and prevented the State and Federal Government enforcement of the TVPA against Defendant Diddy to the extent that the Federal Government was able to ultimately charge Defendant Diddy with TVPA violations, the filing of those charges was delayed by Defendants actions. Because of that delay, Plaintiffs were forced to engage in nonconsensual sex acts.

496.    One example of how Defendants obstructed, attempted to obstruct, interfered with, and prevented State and Federal Government's enforcement of the TVPA, Defendants provided resources to Defendant Diddy, like security, victims, drugs, getaway driver and false alibi's so that the forced sex acts would escape the detection of State and Federal law enforcement and prosecuting agencies. Defendants provided these resources to further the Diddy Sexual Abuse and Cover Up Enterprise sex trafficking venture with the purpose of helping Defendant Diddy and the other Defendants in evading criminal liability for violating the TVPA.

497.    By providing this type of support to Defendant Diddy, Defendants intended and knew that Defendant Diddy's depraved and egregiously forced sex acts would

escape the detection of law enforcement and prosecuting agencies for some period of time.

498.    Defendants support furthered the Diddy Sexual Abuse and Cover Up Enterprise sex trafficking venture with the purpose of helping Defendant Diddy evade criminal liability for violating the TVPA.

499.    Upon information and belief, Defendants obstruction, attempted obstruction, interference with, and prevention of the enforcement of the TVPA were all done intentionally and knowingly. For example, Defendants knew that Defendant Diddy was high risk— specifically, high risk to violate the TVPA through continuing criminal sex trafficking activities due to his proximity to criminal activity as far back as 1991.

500.    Upon information and belief, Defendants were aware and participated and engaged in witness intimidation, and bribery to escape criminal liability. Including offering Plaintiff money to say that the sexual abuse and rape she suffered was consensual and for Plaintiff to say she was a sex worker. Defendants were fully aware that there were public allegations that Defendant Diddy's illegal conduct made through complaints in previous lawsuits. Defendants concealed information from the Federal Government in an intentional attempt to obstruct, in many ways interfered with, and prevented the enforcement of the TVPA by investigators and prosecuting agencies.

501.    Upon information and belief, Defendants relationship with Defendant Diddy went far beyond a normal (and lawful) partnership, relationship and friendship.

Defendants knew, and intended, that its relationship with Defendant Diddy would go far beyond a normal relationship. Defendants knew that its decision to go beyond a normal employment and personal relationships with Defendant Diddy obstructed the ability of law enforcement and prosecuting agencies to enforce the TVPA.

502.    Upon information and belief, Defendants obstruction of the government's TVPA and other law enforcement efforts was intentional and willful and, therefore, Defendants intentionally and willfully caused Defendant Diddy's commission of the forcible sex acts with Plaintiffs through its obstruction supporting the concealment of the Diddy Sexual Abuse and Cover Up Enterprise sex trafficking venture. Defendants knew that Defendant Diddy would use means of force, threats of force fraud, coercion, and a combination of such means to cause Plaintiff to engage in nonconsensual sex acts.

503.    Upon information and belief, Defendants knew, acted in reckless disregard of the fact, and should have known, that its obstruction in violation of 18 U.S.C. § 1590(b) would directly and proximately lead to unlawful and forceful sex acts by Defendant Diddy with individuals, like Plaintiffs.

504.    Upon information and belief, Defendants obstruction has caused Plaintiffs serious harm, including, without limitation, physical, psychological, financial, and reputational harm. That harm was directly and proximately caused by the obstruction and the harm resulting from obstruction was foreseeable.

505.    Upon information and belief, Defendants obstruction has caused Plaintiffs harm that is sufficiently serious, under all the surrounding circumstances, to compel

a reasonable person of the same background and in the same circumstances to perform or to continue performing sexual activity to avoid incurring further harm.

506.    Upon information and belief, Defendants criminal conduct in obstructing enforcement of the TVPA was outrageous and intentional because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization.

507.    Defendants' obstruction also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Defendants' actions were directed specifically at Plaintiffs who were the victims of the Diddy Sexual Abuse and Cover Up Enterprise sex trafficking organization.

508.    By virtue of these violations of 18 U.S.C. § 1590(b), Defendants are liable to Plaintiffs for the damages they sustained and reasonable attorneys' fees by operation of 18 U.S.C. § 1595. Defendants perpetrated an obstruction of the TVPA, and therefore perpetrated a violation of Chapter 77, Title 18.

### NINETEENTH CAUSE OF ACTION
### FALSE IMPRISONMENT
*(Plaintiffs Against All Defendants)*

509.    Plaintiffs incorporate by reference and reallege each of the preceding paragraphs and all paragraphs below as though fully set forth and brought in this cause of action.

510.    Defendants intentionally detained, and/or prevented Plaintiffs from leaving the premises therefore imprisoning Plaintiffs acting in deliberate malice and for the

purpose of trafficking and/or sexually assaulting and raping Plaintiffs. Defendants imprisoned Plaintiffs without just or reasonable cause, without lawful privilege, without Plaintiffs' consent, and/or without probable cause for an appreciable amount of time; and therefore, deprived Plaintiffs of their personal civil liberties. Defendants' unlawful conduct resulted in the false imprisonment of Plaintiffs on March 23, 2018.

511.    Plaintiff Parham was invited to Defendant Shane's home as a guest. Plaintiff was under the impression she was in a safe environment where only she and Defendant Shane would be present.

512.    On or about the date enumerated above, Plaintiff Parham's clothes, phone, purse, keys and cell phone were hid and confiscated in an effort to prevent her from leaving the premises after Defendant Diddy and the other Defendants arrived at Defendant Shane's residence.

513.    Defendants forced Plaintiff Parham, against her will and over her protest, with threats of physical violence forced Plaintiff to engage in nonconsensual sexual activities with Defendants Diddy, Shane, Odell, Druski and Doe.

514.    Defendants forced Plaintiffs Does, against their will and over their protest, with threats of physical violence trafficked, battered, assaulted and abused Plaintiffs.

515.    Plaintiffs were not released from their imprisonment until they made their harrowing escape as enumerated above in this Complaint.

516.    Plaintiffs believe that procuring their false imprisonment was made intentionally, with actual malice, and was intended to harm Plaintiffs solely for

purpose of the sexual gratification of Defendant Diddy and in furtherance of the Diddy Sexual Abuse and Cover Up Enterprise .

517.    Malice is attributable to Defendant Diddy's actions as a joint tortfeasor in that he joined and facilitated the false imprisonment and maliciously instigated it. Malice is further attributable to Defendants Gonzalez, Valdez, Jaguar and Helena as security personnel for Defendant Diddy whose actions independently based on the fact that Defendant Diddy wanted to prevent Plaintiffs from being able to escape.

518.    As a legal result of Defendants' actions, Plaintiffs were physically, mentally and/or emotionally injured, all to an extent and in an amount subject to proof at trial.

519.    Defendants acted with malice and with the intent to cause injury to Plaintiffs or acted with a willful and conscious disregard of the rights of Plaintiffs in a despicable manner. In addition, Defendants engaged in despicable conduct that subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights. Therefore, Plaintiffs are entitled to an award of punitive damages for the purpose of punishing those individual Defendants to deter them and others from such conduct in the future.

520.    As a proximate result of the acts of the Defendants, Plaintiffs have suffered great damage to their person, reputation and embarrassment.

521.    As an approximate results of the acts of Defendants, each of them herein alleged, Plaintiffs have been and will continue to be prevented from having a normal life. The amount of damage done to Plaintiffs are still ongoing and not fully known at this time.

522.     As an additional approximate result of the acts of Defendants, Plaintiffs were injured and their health, strength and activity, sustained shocking injury to their person and injury to their body, requiring several hospitalizations, treatments from therapists and other medical professionals. All of these injuries have caused Plaintiffs to suffer extreme and physical severe physical pain and mental anguish. These injuries will result in some level of permanent disability to the Plaintiffs.

523.     As a further proximate result of the acts of Defendants, Plaintiffs were required to and did employ physicians, therapists and other medical professionals including hospitalizations for medical examinations, treatment, and care for the injuries resulting from this experience. Plaintiffs did and will incur medical and incidental expenses for the services.

524.     The acts of Defendants, each of them herein alleged, were willful, wanton, malicious and oppressive, justifying the awarding of punitive damages.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request judgment against Defendants, awarding compensatory, consequential, exemplary, punitive, restitution, unjust enrichment, equitable, and treble damages in an amount to be determined at trial; costs of suit; attorneys' fees; and such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: March 7, 2025                                        Respectfully submitted,

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Law Offices of Shawn R. Perez**
Shawn Perez (SBN 164228)
shawn@shawnperezlaw.com
7121 West Craig  Rd., #113-38
Las Vegas, NV 89129
Tel: (949) 492-9545

**The Law Office of Ariel Mitchell, P.A.**
Ariel Mitchell (*Pro hac vice*)
ariel@arielesq.com
500 NW 2nd Ave., #12864
Miami, FL 33101
Tel: (305) 903-5835
*Attorneys for Plaintiffs*